John **FONTENOT**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 05–89–00284–CR.

Court of Appeals of Texas,
Dallas

June 14, 1990.

Edgar A. Mason, Dallas, for appellant.

Robert P. Abbott, Dallas, for appellee.

Before HOWELL, LAGARDE and THOMAS, JJ.

## OPINION

THOMAS, Justice.

John Fontenot appeals his conviction of unlawful possession with intent to deliver cocaine. Following a trial to the court, Fontenot was sentenced to five years' confinement in the Texas Department of Corrections,[1] probated for a period of five years. In three points of error, Fontenot contends that: (1) the trial court erred in overruling his motion to suppress evidence; (2) the evidence is insufficient to show that he possessed cocaine with the intent to deliver; and (3) the evidence is insufficient to show that he possessed cocaine. We

---

1. Now the Texas Department of Criminal Justice, Institutional Division.

disagree and accordingly affirm the trial court's judgment.

## FACTUAL BACKGROUND

Officers Lance Raymond and Michael E. Finlay were dispatched to the Red Roof Inn in Dallas, Texas at approximately 11:00 p.m. In the lobby of the motel they met Samantha Hamilton who advised the officers that she had lost her purse the night before and she believed it was in Jerry Smyrski's car that was parked at the motel. Hamilton told the officers that she had gone to the motel earlier to find Smyrski and looked in the room as much as they would let her and also in Smyrski's car, but she got scared and left. Hamilton also told the officers that she had seen Smyrski with a gun the day before. Hamilton further stated that Fontenot and Smyrski had been "partying" the night before in the room and there were drugs involved. After talking with Hamilton, the officers and either the motel manager or a security guard went to the motel room to look for Hamilton's purse. Officer Raymond knocked on the door, someone asked who was there and he responded "police officers." After a short pause, Smyrski answered the door. Officer Raymond explained that they were investigating the possibility of a misplaced purse. Officer Raymond asked Smyrski if they could come in and he replied, "Yes, you may come in." Officers Raymond and Finlay entered the room and saw Fontenot rush into the bathroom and close the door. After they entered the room, the officers did a visual inspection for their safety because of Hamilton's report that she had seen Smyrski with a gun the day before. Officer Raymond began talking to Smyrski, and when Fontenot came out of the bathroom, Officer Raymond asked who the room belonged to and "would it be okay to look around?" Fontenot responded, "Well, yes, but what's this about?" Officer Raymond said that they were looking for a purse. For their safety, Officer Raymond walked around the room and looked in the bathroom but did not see anyone. In addition to Fontenot and Smyrski, Nelson McFarland and Dottie Gray were in the room. Officer Raymond went back to the front door and began talking to Smyrski. Officer Raymond was told that Hamilton had already been to the room earlier that night and had looked in Smyrski's car for her purse. Officer Raymond asked if he could look in Smyrski's car and he said yes. Officer Raymond and Smyrski went outside and Officer Finlay remained in the room.

Officer Finlay asked Fontenot if anyone else was in the bathroom. When Fontenot did not answer, Officer Finlay thought that someone might be hiding, so he opened the bathroom door to look for himself. Because the shower curtain was closed, he pulled it open and discovered a briefcase in the bathtub. Stacked on top of the briefcase were newspapers, syringes, clear plastic bags with substances in them he believed to be drugs, and a brown bottle made into a pipe. Officer Finlay asked Officer Raymond to come back in the room and told him that he had found drugs in the bathroom. Officer Raymond went into the bathroom, picked up the briefcase from the bathtub, and brought it out and set it on a counter. The contents of the briefcase were described as: a spoon, a package of syringes, a bottle made to be a cocaine pipe, a clear glass tube, some packets with substances later identified as 460 milligrams of cocaine, a calculator, and a certificate of title and an automobile registration form in Fontenot's name. Fontenot was subsequently placed under arrest by Officer Finlay. Prior to the arrest, Fontenot had stated that the room was his in response to Officer Raymond's inquiry. After Fontenot was arrested, the officers did a pat-down search of Smyrski and McFarland. Because they had found drugs and had not found the purse, Officer Raymond then walked over to a second briefcase that was sitting on a television set in the room and asked who it belonged to. Smyrski answered that the briefcase was his. Officer Raymond opened it and found drug paraphernalia, drugs and a gun. Smyrski was then placed under arrest.

The defense called three witnesses. Dottie Gray testified that she arrived at Fontenot's motel room earlier that afternoon.

**252**

Gray said that Hamilton came to the room looking for her purse and accusing Smyrski of stealing it. Gray helped Hamilton look through the room and also in Smyrski's car, but they could not find it so Hamilton left. When they heard a knock at the door Gray and Smyrski looked out the curtain to see who it was. She saw two officers and told the others it was the police. Gray opened the door half way and the others were crowded behind her to see who was there. The officers told her that the people upstairs complained that their music was too loud and she told them that they did not have a radio. They asked if she was Dottie Gray and asked her to step outside, which she did and closed the door behind her. As they were standing in the parking lot, the officers asked her if she knew where Hamilton's purse was. She told them that she did not know where it was and that she had helped Hamilton look for it earlier. The officers told Gray to stand outside against the wall. When she tried to go in the room to get her purse, the officers would not let her go back in. The officers then opened the motel room door and walked into the room. Gray testified that she did not hear them ask permission to enter. Gray remained outside for about twenty minutes. Gray testified that she saw cocaine in the room on the bathroom counter but she did not know who it belonged to. She did see Fontenot, Smyrski, and Hamilton touch it, and everyone in the room knew it was there and some used it.

McFarland testified that Fontenot picked him up between 8:00 p.m. and 9:00 p.m. Gray and Hamilton were with Fontenot when they picked McFarland up, and they all went to the motel so that Fontenot could get dressed. Smyrski later came to the motel room. Hamilton, Gray, and Smyrski went out to Smyrski's car to look for her purse. Gray and Smyrski later came back in the room without Hamilton. Fontenot was in the bathroom getting ready when there was a knock at the door. Gray answered the door, and the police told her that there was a complaint about loud music. She responded that they did not have any music on. McFarland testified that no one knew it was the police before

they answered and no one went to the door with Gray. The police talked to Gray outside and then entered the room through the door that Gray had left open. McFarland testified that neither he, Fontenot nor Smyrski gave the officers permission to enter the room or to look around, but he did not know whether Gray gave them permission. Fontenot came out of the bathroom and asked the police what was going on and they said it was about a purse. Fontenot told them there was no purse in the room and that it had supposedly been left in the car. McFarland testified that one of the officers stayed outside with Gray while the other officer began searching the room. The officer went into the bathroom and came out and got the other officer. The second officer went into the bathroom and came out with two briefcases. He set them on a counter and asked who they belonged to. Smyrski responded that one of them was his and the other was Fontenot's. The officer then opened the briefcases and said there were drugs in one of them. They arrested Smyrski first and then Fontenot. McFarland testified that he did not see any drugs in the room.

Fontenot testified that he rented the motel room the afternoon of the incident. He picked up McFarland between 8:00 p.m. and 8:30 p.m. They went to the motel and waited for Smyrski to come by. After Smyrski arrived, Gray and Hamilton went outside with him and searched his car. They did not find the purse and Hamilton left. Fontenot went in the bathroom to finish getting ready to go out. While he was in the bathroom, he heard a knock on the door and heard "it's the police." As Fontenot was sitting on the toilet, Smyrski came in the bathroom and put two briefcases on his knees and shut the door. Fontenot set the briefcases over into the bathtub. Fontenot said he saw the newspapers and something stacked on top but did not pay attention to what it was. Fontenot testified that he got up, went into the other room to see what the problem was, closing the bathroom door behind him. He saw two police officers; one was in the room and the other was outside the open door.

Fontenot asked what was going on, and the officer said he wanted to take a look around. Fontenot said, "No, wait a minute. What are we looking for?" The officer talked about the noise in the room and then said he was looking for a purse. The officer went in the bathroom and then called the other officer to the back of the room. The officers brought the briefcases out and set them on a counter. One of the officers asked if the room was registered to Fontenot and when he said yes, he was arrested. Fontenot testified that he never gave the officers permission to be in the room or to search it. Fontenot denied having any drugs in his possession and said he did not see any in the bathroom or in the motel room. He also said that Gray was mistaken about seeing drugs out on the counter and about him touching or using them. Fontenot stated that he had no drugs inside his briefcase. Fontenot also testified that the fifteen hundred dollars in cash found on him when he was arrested was from the sale of a car. Fontenot further stated that he had not seen anyone with a gun the night before.

## MOTION TO SUPPRESS EVIDENCE

■ In the first point of error, Fontenot contends that the trial court erred in overruling his motion to suppress evidence. Specifically, Fontenot contends that the search of the room was a pretextual search for drugs, that when Gray and Smyrski allowed the police to come in the motel room they were doing no more than acquiescing to a show of official authority, and that he did not consent to the search of his room. The State contends that Fontenot voluntarily consented to a search of his motel room, and the initial discovery of narcotics occurred while Officer Finlay was making a reasonable inspection of the bathroom for his own protection.

Both the federal and state constitutions offer individuals protection from unreasonable searches and it is settled that a motel guest is entitled to constitutional protection against unreasonable searches of his or her room. *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). However, an individual may waive this protec-

tion by consenting to the search. *Meeks v. State*, 692 S.W.2d 504, 509 (Tex.Crim.App. 1985); *Arcila v. State*, 788 S.W.2d 587 (Tex.App.—Dallas, 1990, no pet.) One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); *Meeks*, 692 S.W.2d at 509. It is well settled that before consent to search is deemed effective the prosecution must prove by clear and convincing evidence that the consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968); *Kolb v. State*, 532 S.W.2d 87, 89 (Tex.Crim. App.1976). A consent to search may be oral and still be valid. *Montoya v. State*, 744 S.W.2d 15, 25 (Tex.Crim.App.1987), *cert. denied*, 487 U.S. 1227, 108 S.Ct. 2887, 101 L.Ed.2d 921 (1988). The burden requires the prosecution to show the consent given was positive and unequivocal, and there must not be duress or coercion, actual or implied. *Meeks*, 692 S.W.2d at 509. The prosecution's burden, however, cannot be discharged by showing no more than acquiescence to a claim of lawful authority. *Bumper*, 391 U.S. at 548–49, 88 S.Ct. at 1791–92; *Meeks*, 692 S.W.2d at 509. The consent to search is invalid if granted only in submission to a claim of lawful authority. *Meeks*, 692 S.W.2d at 509; *Kolb*, 532 S.W.2d at 90. The question of whether a consent to search was "voluntary" is a question of fact to be determined from the totality of the circumstances. *Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. at 2058–59; *Meeks*, 692 S.W.2d at 510.

Several factors are to be examined in order to determine whether an appellant freely and voluntarily consented: (1) whether, and to what extent, officers exhibited a show of force, including a display of weapons; (2) whether the actions of the arresting officers can be classified as flagrant misconduct; (3) whether the police threatened to obtain a search warrant if the detainee did not acquiesce, or whether the police claimed a right to search; (4)

whether police first gave appellant his *Miranda* warnings; (5) whether the arrest was made in order to obtain consent; (6) whether appellant knew that he could refuse to allow a search; (7) whether consent was first offered by appellant or was in response to police request; (8) appellant's education, intelligence, and physical condition; and (9) the proximity of the consent to the arrest, since an intervening time period can provide a degree of attenuation of the taint. *Arcila*, 788 S.W.2d at 591–92.

With these standards and factors in mind, we review the totality of the circumstances to determine whether the State met its burden by presenting clear and convincing evidence that Fontenot's consent was freely and voluntarily given. In this review, we are mindful that the trial judge is the sole fact finder at a hearing on a motion to suppress, and, as such, he may choose to believe or disbelieve any or all of the witness' testimony. *Taylor v. State*, 604 S.W.2d 175, 177 (Tex.Crim.App. [Panel Op.] 1980); *Matienza v. State*, 699 S.W.2d 626, 627 (Tex.App.—Dallas 1985, pet. ref'd). The State's testimony supports the trial judge's conclusion that the consent was freely and voluntarily given. Officers Raymond and Finlay testified that they went to the motel room only to obtain information about a misplaced purse and not to arrest anyone. Officer Raymond testified that they did not go to the room to find drugs and that neither Fontenot nor Smyrski was a suspect in any kind of crime. Nothing in either the federal or state constitutions prevents a police officer from knocking politely on any closed door. Further, nothing in the statutes or governing constitutional provisions requires any citizen to respond to a knock on his door by opening it. *Rodriguez v. State*, 653 S.W.2d 305, 307 (Tex.Crim.App. [Panel Op.] 1983). The officers entered the room only after the door was opened by someone inside and they were told that they could come in. *Compare Green v. State*, 594 S.W.2d 72 (Tex.Crim.App.1980) (where officers knocked on defendant's motel room door, identified themselves and, with a key furnished by the motel manager, opened the door and found it chained, defendants found not to have

effectively consented to entry even though they unchained the door and told the officers to come in). There was also no testimony presented that the officers exhibited a show of force or that they displayed any weapons. *Compare Clemons v. State*, 605 S.W.2d 567 (Tex.Crim.App. [Panel Op.] 1980) (where one officer brandished a shotgun and each officer was armed with a service revolver, defendants' admittance of officers found to be an acquiescence to a claim of lawful authority). Once inside, the officers did a visual inspection of the room for their own safety because they had reason to believe that someone in the room might be armed. Officer Raymond saw Fontenot rush into the bathroom as they were entering the room and thought it was suspicious. When Fontenot came out of the bathroom, Officer Raymond asked, "Would it be okay to look around?" Fontenot responded, "Well, yes, but what's this about?" Officer Raymond then explained that they were looking for a purse. The evidence does not show that the officers threatened to obtain a search warrant or claimed a right to search. While Officer Raymond was outside talking with Smyrski, Officer Finlay asked Fontenot if anyone was in the bathroom because he thought he might be hiding someone that was armed. When Officer Finlay got no response, he went into the bathroom and pulled open the shower curtain. He then discovered the briefcase with what he believed to be drugs sitting on top of it in plain view. *See Kolb*, 532 S.W.2d at 90 (an officer may seize contraband which he sees in plain sight or open view if he is lawfully where he has a right to be). Upon discovering that the room had been rented by Fontenot, the officer arrested him. Based upon the totality of the circumstances, the evidence establishes that consent was given by Fontenot to search the room and that there was no duress or coercion, actual or implied, exhibited by the officers. Accordingly, we hold that the State met its burden of establishing that Fontenot's consent was freely and voluntarily given. The first point of error is overruled.

## SUFFICIENCY OF THE EVIDENCE

In determining the sufficiency of the evidence, this Court's inquiry is limited to determining whether, evaluating the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Marroquin v. State*, 746 S.W.2d 747, 750 (Tex. Crim.App.1988). In reviewing the evidence, it is irrelevant whether this court believes the evidence or believes that the defense evidence outweighs the State's evidence. The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Bonham v. State*, 680 S.W.2d 815, 819 (Tex. Crim.App.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985).

## INTENT TO DELIVER

In the second point of error, Fontenot contends that the evidence is insufficient to show that he possessed cocaine in an amount over twenty-eight grams with the intent to distribute. We note initially that the indictment charged Fontenot with possession with intent to deliver cocaine in an amount *less than* twenty-eight grams. Accordingly, we will consider Fontenot's point of error to allege that the evidence is insufficient to prove that he possessed the cocaine with the intent to deliver.[2] Fontenot argues that the amount of drugs, the type of packaging and the fact that no evidence was adduced as to the street value of the drugs indicates that the drugs were possessed for personal use and is inconsistent with the conclusion that he intended to deliver them. Additionally, Fontenot maintains that the fact that the drugs were found in a motel room where others were present and had access to them, and where

he was not shown to be in exclusive care, custody, control and management of the drugs, indicates that the drugs were not possessed with intent to deliver. The State maintains that Gray's testimony provided direct evidence that Fontenot constructively transferred cocaine by allowing others in the motel room to use the contraband on the bathroom counter.[3]

The term "constructive transfer" has not been defined by the Legislature, either in the Controlled Substances Act, the Penal Code, or elsewhere. However, in *Daniels v. State*, 754 S.W.2d 214 (Tex.Crim.App. 1988), the Court of Criminal Appeals held that with regard to the meaning of "constructive transfer", the following rules are applicable:

1. Prior to an alleged delivery, the transferor must have either direct or indirect control of the substance transferred.

2. The transferor must know of the existence of the transferee.

*Daniels*, 754 S.W.2d at 221–22; *see also Rasmussen v. State*, 608 S.W.2d 205 (Tex. Crim.App. [Panel Op.] 1980); *Gonzalez v. State*, 588 S.W.2d 574 (Tex.Crim.App. [Panel Op.] 1979). In *Daniels*, the Court cites Black's Law Dictionary for the following definition of delivery: "What constitutes delivery depends largely on the intent of the parties. It is not necessary that delivery should be by manual delivery." *Daniels*, 754 S.W.2d at 220. The Court in *Daniels* also refers to Ballentine's Law Dictionary for a definition of delivery as "[f]or some purposes, a delivery is accomplished by nothing more than making a thing available to another, placing it within his reach, *notwithstanding there is no actual handing of the thing from one person to another." Daniels*, 754 S.W.2d at 220. As in possession cases, the control does not need to be exclusive, and joint control is suffi-

2. In his brief, Fontenot contends that it cannot be concluded that there was an affirmative link between the narcotics found in the room and himself. However, counsel for Fontenot abandoned the affirmative link argument at oral submission conceding that there were sufficient links. The affirmative links are addressed in connection with point of error three.

3. The indictment did not allege the type of delivery that the State would rely on for conviction. We note, however, that Fontenot did not file a motion to quash the indictment and therefore waived any error. *See Valadez v. State*, 408 S.W.2d 109, 111 (Tex.Crim.App.1966); *Wilson v. State*, 398 S.W.2d 291, 293 (Tex.Crim.App.1966) (op. on reh'g).

cient. *Elliott v. State,* 766 S.W.2d 361, 366 (Tex.App.—Texarkana 1989, pet. ref'd).

■ We conclude that the evidence is sufficient to support the conviction for possession with intent to deliver. The motel room was registered to Fontenot. Fontenot admitted that others were present in the room. Gray testified that the drugs were on the bathroom counter and everyone in the room knew they were there. Further, Gray testified that Fontenot, Smyrski and Hamilton had touched the drugs or used them. Fontenot stated that he was the one who placed the briefcase in the bathtub that was found by the officers. The briefcase had drug paraphernalia and cocaine sitting on it and inside the briefcase was a certificate of title and an automobile registration in Fontenot's name. Additionally, fifteen hundred dollars in cash was found on Fontenot. All of this evidence taken as a whole establishes that Fontenot had either direct or indirect control over the cocaine and that he knew of the existence of the transferees and, therefore, had the intent to deliver. Furthermore, we hold that the concept of "delivery" includes sharing drugs with third persons, and is not limited to commercial ventures. *See United States v. Branch,* 483 F.2d 955, 956 (9th Cir.1973) (even if the information received by the officer as to the quantity of controlled substance involved was not sufficient to support an inference of distribution or intent to distribute, the additional information that appellant had "smoked a joint" with another person was; that information brought appellant's conduct within the distribution ban); *United States v. Ramirez,* 608 F.2d 1261, 1264 (9th Cir.1979) (although no commercial scheme was involved, appellant's sharing of cocaine with others constituted distribution). Accordingly, point of error two is overruled.

### POSSESSION

■ In the third and final point of error, Fontenot contends that the evidence is insufficient to show that he possessed cocaine. Fontenot submits that because oth-

ers had access to the drugs in the room, he was not shown to be in possession of the drugs and, therefore, there is insufficient evidence to affirmatively link him to either joint or sole possession of the drugs.[4] When an individual is charged with unlawful possession of a controlled substance, the State must prove two essential elements: (1) that the accused exercised care, control and management over the contraband; and (2) that the accused knew the matter was contraband. *Martin v. State,* 753 S.W.2d 384, 387 (Tex.Crim.App.1988). Possession need not be exclusive to the accused, but when more than one person exercises control over the contraband, some affirmative link must exist between the accused and the contraband. *McGoldrick v. State,* 682 S.W.2d 573, 578 (Tex.Crim.App.1985). Placing the accused in the vicinity of the contraband is not enough. *Smith v. State,* 737 S.W.2d 933, 941 (Tex.App.—Dallas 1987, pet. ref'd). The affirmative link, consisting of additional facts and circumstances, must establish the essential possession elements of control and knowledge. *Smith,* 737 S.W.2d at 941. Several Court of Criminal Appeals decisions have listed factors relevant to the determination of whether an affirmative link exists. These include: whether the contraband was in open or plain view, *Guiton v. State,* 742 S.W.2d 5, 8 (Tex.Crim.App.1987); whether the accused handled the contraband, *see McGoldrick,* 682 S.W.2d at 580; whether the appellant was in the place searched at the time of the search, *see Martin,* 753 S.W.2d at 387; whether the contraband was conveniently accessible to the accused, *Guiton,* 742 S.W.2d at 8; whether the accused owned or controlled the place where the contraband was found, *Guiton,* 742 S.W.2d at 8; and whether the accused made any incriminating statements at the time of the arrest, *Martin,* 753 S.W.2d at 387.

Applying these factors to the present case, we hold that the State proved an affirmative link between Fontenot and the cocaine which was sufficient to allow a

---

**4.** As previously noted, counsel for Fontenot conceded that there were sufficient links. However, he limited this concession to point of error two. We therefore address the argument here.

rational trier of fact to find possession by Fontenot beyond a reasonable doubt. Fontenot rented the motel room where the cocaine was found. Gray testified that everyone in the room knew the drugs were there on the bathroom counter and that Fontenot touched or used the drugs. When Officer Finlay found the cocaine, it was sitting on top of Fontenot's briefcase in plain view along with other drug paraphernalia. Additionally, it was Fontenot who placed the briefcase with the drugs into the bathtub, and he was the only one the officers saw enter the bathroom. Because additional facts and circumstances, beyond simple presence in the motel room, affirmatively link Fontenot to the cocaine, thereby establishing the control and knowledge elements of possession, we overrule Fontenot's final point of error and affirm the judgment of the trial court.