Charles **FRIERSON**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 05–90–01517–CR.

Court of Appeals of Texas, Dallas.

June 23, 1992.

Rehearing Denied Aug. 25, 1992.

Larry Finstrom, Dallas, for appellant.

Patricia Poppoff Noble, Dallas, for appellee.

Before LAGARDE, OVARD and BURNETT, JJ.

## OPINION

BURNETT, Justice.

Charles Frierson appeals his conviction for possession of methamphetamine in an amount of 400 grams or more. The jury assessed punishment at fifty years' confinement and a $75,000 fine. In eight points of error, Frierson asserts that (1) the evidence is insufficient to support the verdict of methamphetamine possession in an amount of 400 grams or more, (2) the State used its peremptory challenges in a racially discriminatory manner, and the trial court erred by (3) failing to charge the jury on the lesser included offense of methamphet-amine possession in an amount less than 28 grams, (4) excluding evidence tending to establish ill will, bias, motive, or animus of a State's witness and evidence regarding Frierson's consent to let a police officer enter the premises, and (5) admitting evidence over his objection because the evidence came from an illegal search. We overrule Frierson's points of error. We affirm the trial court's judgment.

## FACTS

Officer Leroy Brantley and Investigator Jim Walling responded to a "robbery-in-progress-shots-fired" call around ten o'clock one night. They found Charles Frierson and a friend in Frierson's garage. Frierson told Officer Brantley that two men had tried to rob him as he got out of his car. One robber sprayed mace in his eyes and ran away. Frierson had shot at the robbers but, due to the mace, he did not know if he actually shot anyone. Frierson's son Stephen and Frierson's live-in girlfriend Deborah Leonard came out of the house. Officers Barry Dyson and Sergeant Thomas Ward arrived at the house. Officer Brantley gave them the robbers' descriptions. Officer Brantley asked to see the gun in case one of the robbers or a neighbor had been hit by a bullet. Frierson said that he would get the gun. Officer Brantley testified that Stephen told Frierson to stay there and he would show the gun to the officer. Stephen testified that he said he would get the gun, but Officer Brantley followed him into the house.

Officer Dyson left to search the surrounding area. The paramedics arrived and began treating Frierson in the garage. Stephen lead Officer Brantley into the master bedroom and opened a cabinet door. The gun was laying on a shelf. On the shelf above the gun, Officer Brantley saw a clear-plastic, gallon-size bag of marijuana.

Officer Dyson returned to the house. Officer Brantley showed the marijuana to Investigator Walling and Officer Dyson. The officers took Frierson, Stephen, Deborah, and Frierson's friend into the living room and questioned the four people about

who lived at the house. They released Frierson's friend because he was not an occupant of the house. Frierson, Stephen, and Deborah refused to consent to a search of the rest of the house. Officer Dyson left to obtain a search warrant. Officer Brantley arrested Frierson and took him into custody. Deborah said that she wanted to change clothes before going to the police station. Sergeant Ward searched the bathroom before letting her use the bathroom to change her clothes. He found more marijuana in a box under the sink. He contacted Officer Dyson. This marijuana was also used to establish probable cause to search the remainder of the house.

The warrant allowed the officers to search the premises for marijuana. The officers found marijuana, cocaine, methamphetamine, and about $200,000 in cash. Underneath the bed, the officers found a white garbage bag that contained nine pill bottles filled with methamphetamine tablets (MDMA), known in street terms as "ecstasy." The tablets weighed 1448 grams.

### SUFFICIENCY OF THE EVIDENCE

■ In two points of error, Frierson asserts that the evidence is insufficient to sustain his conviction. In his first point of error, Frierson asserts that the evidence is insufficient to support his conviction for MDMA possession in an aggregate weight, including any adulterants or dilutants, of 400 grams or more. In his fifth point of error, Frierson asserts that the evidence is insufficient to prove that he "possessed" the tablets.

In determining the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict. We determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Turner v. State*, 805 S.W.2d 423, 427 (Tex.Crim. App.), *cert. denied,* —— U.S. ——, 112 S.Ct. 202, 116 L.Ed.2d 162 (1991). This standard applies in both direct and circumstantial evidence cases. *Id.*

In a circumstantial evidence case, the "reasonable doubt" portion of the test is satisfied if the evidence excludes every reasonable hypothesis except the defendant's guilt. *Carlsen v. State*, 654 S.W.2d 444, 447 (Tex.Crim.App.1983) (op. on reh'g).[1] This does not mean that if evidence presented at trial suggests innocence, the trier of fact cannot find the defendant guilty. *Castro v. State*, No. 835–90, slip op. at 3, 1992 WL 1131 (Tex.Crim.App. January 8, 1992). The trier of fact is charged with the responsibility of resolving factual questions. *Id.* In this process, a trier of fact may reject evidence and testimony that suggests innocence. *Id.* The trier of fact is the sole judge of the witnesses' credibility and can believe all or any part of the testimony. *Williams v. State*, 692 S.W.2d 671, 676 (Tex.Crim.App.1984).

### Aggregate Weight of Methamphetamine

■ The Texas Health and Safety Code lists MDMA under Penalty Group II. An aggravated offense under this group is the possession of 28 grams or more. *See* Tex. Health & Safety Code Ann. § 481.116(c) (Vernon Pamph.1992). Section 481.116 also increases the punishment range if the amount possessed, plus any adulterants or dilutants, is 400 grams or more. *See* Tex Health & Safety Code Ann. § 481.116(d)(2) (Vernon Pamph.1992). Where the State attempts to aggravate a possession offense by totaling the weight of the controlled substance and any adulterants or dilutants, the State must prove beyond a reasonable doubt: (1) the identity of the named illegal substance; (2) that the remainder was an adulterant or dilutant; and (3) the weight of the illegal substance, including any adulterants and dilutants. *See Cawthon v. State*, No. 1170–90, slip op. at 3–4, 1992 WL 73489 (Tex.Crim.App. April 15, 1992).

---

1. The Court is aware of the Court of Criminal Appeals opinion in *Geesa v. State*, 820 S.W.2d 154, 161 (Tex.Crim.App.1991), which overrules *Carlsen* and eliminates the "reasonable hypothesis" appellate construct for determining sufficiency of the evidence. However, *Geesa* expressly applies only to cases tried after the November 6, 1992 issuance date of the opinion. *Id.* Frierson was tried in September 1990.

First, the State established the identity of the controlled substance through expert testimony. Kenneth Evans, the State's expert witness, analyzed representative samples from each bottle. Each pill contained MDMA. He did not identify the remainder of the substance in the tablet because it did not interfere with his analysis.

■ Second, the State had to prove that the remainder of the tablet was an adulterant or dilutant. Adulterants or dilutants are composed of compounds, substances, or solutions added to the controlled substance with intent to increase the bulk or quantity of the final product without affecting the chemical activity of the controlled substance. *See Cawthon*, No. 1170–90, slip op. at 2; *Engelking v. State*, 750 S.W.2d 213, 216 (Tex.Crim.App.1988); *McGlothlin v. State*, 749 S.W.2d 856, 860 (Tex.Crim. App.1988). Frierson argues that the evidence is insufficient because the State's chemist made no attempt to establish the purity of the MDMA tablets or to identify the remainder of the tablet beyond the presence of the MDMA and the experts' testimony only established the presence of binders.

The two expert witnesses testified that binders had to be present to hold the tablet together. Frierson's expert Jack Castle testified that a binder is absolutely necessary to form the pill, but is not added with the intent to increase bulk. According to his testimony, however, the weight of the tablets include MDMA, adulterants and dilutants,[2] salts, isomers, water, binders, and any coloring agents that might be used in the preparation of the tablets.

He further testified that:

You take the ecstasy powder or the MDMA powder, you add any other materials that you intend to add to it. You add materials to make it into a tablet. Say you had a hundred milligram dose of ecstasy and you made that into a tablet all by itself, the tablet would be very tiny. It would be easy to lose, drop, misplace, so you've got to add something

to make it larger, more visual, and where you can get your hands on it.

On cross-examination, Castle testified that the binder does increase the bulk and that purchasers understand that they are not getting pure MDMA when they buy an ecstasy tablet. Evans also testified that binders had to be present for the tablet to hold together, and that the binders increase the bulk of the tablet.

This situation presents us with the problem of a final product ready for consumption or sale, not the by-product solutions from the manufacture of the original controlled substance. *See Reeves v. State*, 806 S.W.2d 540, 543–44 (Tex.Crim.App.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991); *Herndon v. State*, 767 S.W.2d 510, 513 (Tex.Civ.App.—Fort Worth 1989, pet. ref'd). *Engelking* and *McGlothlin*, the cases where the Court first defined adulterants and dilutants, involved the seizure of solutions from various stages of amphetamine production. *See Engelking*, 750 S.W.2d at 214; *McGlothlin*, 749 S.W.2d at 857. The percentage of the controlled substance found in the solutions was very small. The State attempted to aggravate the offense by adding in the seized solutions. The evidence showed that water was added to complete the manufacturing process, not to increase the bulk or quantity of the amphetamine. *See Engelking*, 750 S.W.2d at 214; *McGlothlin*, 749 S.W.2d at 857.

In *Reeves*, the State indicted the defendant for delivering amphetamine over 28 grams but less than 400 grams after he sold 29.72 grams of a wet, white, powdery substance to an undercover officer. *Reeves*, 806 S.W.2d at 542. The jury charge mirrored the indictment, but the definition defined the weight of the controlled substance to include any adulterants and dilutants. *Id.* at 543. The Court of Criminal Appeals found that the evidence was insufficient under the charge or the definition. *Id.* at 543 n. 4. The State did not prove that the 29.72 grams seized

---

**2.** The statute uses the word 'dilutant' except in section 481.002(17)(F) which refers to 'diluent.' Both experts used the word 'diluent.' The Court

of Criminal Appeals considers the terms to be synonymous. *See McGlothlin*, 749 S.W.2d at 859 n. 6.

was pure amphetamine. *Id.* at 544. On the other hand, the State did not prove the existence of any other substance in the bag. *Id.* If there were other substances, the record contained no evidence on whether they were there to increase the bulk or merely the by-products of manufacturing. The Court concluded that the remainder of the substance other than the amphetamine, if any, could not be said to be an adulterant or dilutant. *See id.*

Unlike *Engelking* and *McGlothlin,* this case involves tablets that are ready for distribution and consumption. *See Herndon,* 767 S.W.2d at 512–13. Unlike *Reeves,* the record contains evidence that there were other substances besides MDMA in the tablets. *See Reeves,* 806 S.W.2d at 544. Frierson's own witness testified that something had to be added to make the pills a manageable size and users adjust their dosage because they do not expect pure MDMA. The existence of the physical tablet in light of the experts' testimony allowed the jury to reasonably infer that the tablets were not pure MDMA, but contained some compound to make them a manageable size and to hold them together.

The Court of Criminal Appeals held recently that the State must prove the remainder had not affected the "chemical activity" of the controlled substance to be an adulterant or dilutant. *See Cawthon,* No 1170–90, slip op. at 2–3. The Court noted that the expert testified that the substance was about twenty-five percent amphetamine without analyzing the rest of the substance. *Id.,* slip op. at 1. The Court concluded that the record lacked any testimony regarding the nature of the rest of the substance and that the State did not prove that the unidentified portion was added to the amphetamine with the intent to increase its bulk or quantity without affecting its chemical activity. *Id.,* slip op. at 4.

In *Cawthon,* the Court used the term "chemical activity" without explaining it within the context of the Texas Controlled Substances Act. *See Id.,* slip op. at 2–3. The Act does not define controlled substances by their chemical activity. Rather,

it prohibits the possession of particular chemical compounds such as MDMA. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.103 (Vernon Pamph.1992). Under the Act, adulterants are diluents are substances intended for use in cutting a controlled substance. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.001(17)(F) (Vernon Pamph. 1992). From the *Cawthon* opinion, we conclude that, in order for the State to use the remainder to aggravate a possession offense, the State must prove that the remainder was added to the controlled substance with the intent to increase its quantity or bulk, and not with the intent of reacting the controlled substance and the remainder to form another chemical compound such as in intermediate stages of manufacturing. *See Cawthon,* slip op. at 2–3; *Engelking,* 750 S.W.2d at 214; *McGlothlin,* 749 S.W.2d at 857.

In this case, Evans did not particularly identify the remainder of the tablet. However, he did testify to the nature of the remainder of the tablets. Evans gave the following testimony on his chemical analysis of the tablets:

> [STATE]: Can you tell the jury exactly what steps you went through in performing an analysis?
>
> [EVANS]: Okay. In the analysis that was performed on each of the bottles, the contents of each of the bottles, each bottle was weighed individually, the tablets were removed, then the bottle was weighed again to get an accurate weight of the tablets inside the bottle. Then a series of color tests were performed on the contents of each—a sample of the tablets, and then two instrumental analyses were run on the contents of those representative samples from the bottles.
>
> I ran an I.R. or infrared spectra on each bottle contents, of the representative sample, which is attached to the outside. So, that was a total of nine bottles, so a total of nine I.R.s and nine U.V.s or ultraviolet spectras were performed on each of the bottles.
>
> [STATE]: What is the "I.R." or the— what did you call it?
>
> [EVANS]: Infrared spectra.

[STATE]: Infrared spectra, what does that show?

[EVANS]: The infrared spectra would show the actual analysis or the actual compound that would be contained in the tablets. It's an [sic] identifying characteristics, which I would obtain, with an infrared spectra. A U.V. spectra is more—or a ultraviolet spectra would be more of a scanning or a preliminary-type instrumental analysis technique that I would use.

[STATE]: And what were the results of your tests?

[EVANS]: The results of the test was that the tablets contain 3, 4 methylene dioxy methamphetamine.

[STATE]: And was that true with each of the tests that you used?

[EVANS]: Yes, it was.

*    *    *    *    *    *

[STATE]: Do you analyze for the identity of any adulterants or diluents?

[EVANS]: No, we do not.

[STATE]: Is that part of the policy out at the D.P.S. Lab?

[EVANS]: Well, in this case, the adulterants and diluents were not interfering compounds that were messing up any of the techniques, the [Infrared Ultraviolet] spectra, that I used for my analyses.

[STATE]: What does that mean?

[EVANS]: Well, they were not—the compounds, adulterants and diluents, that were used in this case were not any, what you would say—let's take, for example, like caffeine. That would not show up in any of my tests; therefore, there were not any—there was no interference from the adulterants and diluents that were used, that were there to contaminate my sample for [Infrared Spectra].

[STATE]: In other words, you were able to obtain a pure reading of 3, 4 methylene dioxy methamphetamine regardless of what else was contained?

[EVANS]: That is correct.

[STATE]: Let's talk about, then, all the rest of the product that is contained within a tablet. A certain amount of it is a pure 3, 4 methylene dioxy methamphetamine; is that correct?

[EVANS]: That is correct.

[STATE]: All right. What would the rest of the contents of the tablet be?

[EVANS]: They would be possibly binders since they are tablets.

[STATE]: Is a binder an adulterant or diluent?

[EVANS]: Yes, it would be.

[STATE]: And what is your definition of "adulterant" or "diluent"?

[EVANS]: In this case "adulterant" and "diluent" are—would be a compound added to a substance to increase its bulk.

[STATE]: Is that true of any of the rest of the products other than the pure Ecstasy?

[EVANS]: That is true.

Since tablets are a final form ready for distribution and consumption, and the evidence showed the presence of MDMA, the jury could reasonably infer that the remainder of the tablet was a substance or compound intended to increase the bulk of the tablet without affecting the chemical activity of the MDMA. When viewing the evidence in the light most favorable to the verdict, the State proved beyond a reasonable doubt that the remainder in the tablets was adulterants or dilutants.

Finally, Evans testified that he weighed the tablets in all nine bottles. The tablets weighed 1448 grams. Castle testified that his test showed the weight to be slightly higher. The evidence showed that the amount of the controlled substance, including any adulterants or dilutants, exceeded 400 grams. We overrule Frierson's first point of error.

### Possession

■■■ The State must prove two essential elements when it charges an individual with unlawful possession of a controlled substance: (1) that the individual exercised care, control, and management over the contraband; and (2) that the individual knew the matter was contraband. *Martin v. State*, 753 S.W.2d 384, 387 (Tex.Crim. App.1988). Possession need not be exclusive but, when more than one person exer-

cises control over the contraband, some affirmative link must exist between the accused and the contraband. *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex.Crim. App.1985). The Court can examine circumstantial factors to determine if sufficient affirmative links exist, such as the amount found, its location in relationship to appellant's personal belongings, appellant's relationship to other persons with access to the premises, incriminating statements, and proximity of appellant to the contraband. *See Earvin v. State*, 632 S.W.2d 920, 924 (Tex.Crim.App.1982); *Pollan v. State*, 612 S.W.2d 594, 596 (Tex.Crim.App.1981).

■ Frierson argues that the State did not prove sufficient affirmative links between him and the MDMA tablets because he was not the sole occupant of the house or the bedroom. The officers found large amounts of drugs throughout the master bedroom and bath, such as marijuana under the bathroom sink; cocaine, methamphetamine, and marijuana in a master bedroom dresser drawer; the MDMA tablets under the bed; a marijuana pipe in the master bedroom; $78,000 in a safe in the master bedroom; and an additional $100,-000 in a briefcase and tote bag. The first bag of marijuana found in Frierson's bedroom was in plain view on the cabinet shelf above the gun.

The evidence showed that there were large amounts of contraband and money found in the bedroom that Frierson shared with his girlfriend. The amount of drugs and money found in his bedroom and his relationship to the other two occupants of the house indicate that he at least exercised joint control over the drugs. The evidence sufficiently supports the jury's finding that Frierson possessed the MDMA tablets found under the bed in his bedroom. We overrule his fifth point of error.

## JURY CHARGE ON LESSER INCLUDED OFFENSE

In his second point of error, Frierson asserts that the trial court erred by not charging the jury to consider the lesser included offense of MDMA possession in an amount less than 28 grams. He argues that he is entitled to the charge because the State offered no evidence of the amount of pure MDMA contained in the tablets or the weight of the adulterants or dilutants.

■ The trial court is only required to charge the jury on the lesser included offense if there is evidence that the defendant, if guilty, is guilty of only the lesser offense. *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex.Crim.App.1985). The evidence is uncontroverted that the tablets weighed at least 1448 grams. There is no evidence that the MDMA, including any adulterants or dilutants, weighed less than 28 grams. The evidence did not show that Frierson might be guilty of only the lesser included offense. The trial court did not err by denying Frierson's objection and refusing to submit an instruction on MDMA possession in an amount less than 28 grams. We overrule his second point of error.

## EXCLUSION OF EVIDENCE

### Civil Forfeiture Proceeding

■ In his third point of error, Frierson asserts that the trial court erred in excluding evidence of the civil forfeiture that would tend to establish ill will, bias, motive, or animus of the State's witness. Frierson complains that the trial court denied him a fair trial by sustaining the State's objection to cross-examination of a police officer about the civil forfeiture proceeding related to this case.

■ A defendant should be allowed great latitude in showing any fact, including pending charges, that tends to show bias, ill feeling, motive, or animus on the part of any witness who testifies against him. The trial court has considerable discretion as to how such matters may be proved and as to what collateral evidence is material for that purpose. *See Deloney v. State*, 734 S.W.2d 6, 9 (Tex.App.—Dallas 1987, pet. ref'd). Under the Texas Rules of Criminal Evidence, the trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consid-

erations of undue delay, or needless presentation of cumulative evidence. *See* TEX. R.CRIM.EVID. 403. Generally, a defendant is permitted to show that the complaining witness has brought a civil suit for damages based on the same occurrence for which the defendant is being prosecuted. However, those cases that have held such evidence to be admissible are limited to those circumstances where the complaining witness brings a collateral civil action against the accused. *See Deloney,* 734 S.W.2d at 9.

Frierson attempted to impeach Sergeant Ward by showing his economic interest in the outcome of this case. Sergeant Ward was patrolling with Officer Dyson that night. He remained in the house after the arrests and assisted Investigator Walling and Officer Dyson in searching the house under the warrant. Frierson wanted to question Sergeant Ward on whether the department, through a civil forfeiture suit, might receive a large sum of money after successful prosecution in this offense. The Court sustained the State's objection to this line of questioning and allowed Frierson to make a bill of exceptions. Sergeant Ward then testified that there were two civil forfeiture suits seeking more than $200,000. Twenty percent of the money would go to the Dallas County District Attorney's office and the rest would go to the Rowlett Police Department. He also testified that he did not stand to gain personally from these actions and believed that the civil actions were unrelated to the facts to which he testified in this criminal prosecution.

The Texas Code of Criminal Procedure provides that any proceeds and any property acquired with the proceeds from the commission of a felony under the Texas Controlled Substances Act is subject to seizure and forfeiture. *See* TEX.CODE CRIM. PROC.ANN. arts. 59.01–02 (Vernon Supp. 1992). Sergeant Ward gains only indirectly, if at all, from any assets that are forfeited. He personally did not bring a corresponding civil suit against Frierson that might influence his testimony. *See Deloney,* 734 S.W.2d at 9. This is true for any police officer testifying in any criminal case

that has a corresponding civil forfeiture suit. The evidence has marginal relevance to Sergeant Ward's testimony. The trial court did not abuse its discretion in sustaining the State's objection to this cross-examination. We overrule his third point of error.

### Consent to Search

In his fourth point of error, Frierson asserts that the trial court wrongfully excluded evidence supporting his contention that there was no effective consent to enter his premises. Frierson attempted to question Sergeant Ward as an expert witness about the law of warrantless searches. Frierson argues that he should be free to introduce expert testimony that would assist the jury in deciding whether consent was initially given by him for Officer Brantley to enter his house.

An expert's qualifications are committed to the trial court's discretion. *Holloway v. State,* 613 S.W.2d 497, 501 (Tex.Crim.App.1981); *Perryman v. State,* 798 S.W.2d 326, 329 (Tex.App.—Dallas 1990, no pet.). Expert opinion evidence is generally inadmissible when the evidence is on a subject that any other person could form an opinion on as readily and with the same degree of logic as the witness. *Holloway,* 613 S.W.2d at 500. Occupational status relating to the subject in question does not establish expert qualifications. *Id.* at 501.

After the court sustained the State's objection, Frierson made a bill of exceptions by questioning Sergeant Ward on various hypothetical situations involving warrantless searches based on consent. Sergeant Ward's status and experience as a law enforcement officer are insufficient to qualify him as an expert. Whether Frierson or someone else with authority gave permission to or allowed Officer Brantley to enter the house does not require further evidence for the jury to form a logical opinion.

The trial court did not abuse its discretion by not allowing Sergeant Ward to give expert opinion testimony on the law of war-

rantless searches based on consent. We overrule Frierson's fourth point of error.

## MOTION TO SUPPRESS

### Consent to Search

■ In his sixth point of error, Frierson asserts that the trial court erred in admitting evidence of the fruits of the search because there was no evidence of free and voluntary consent by him or a person with authority. Frierson argues that there was no evidence that established Stephen could give valid consent to allow Officer Brantley into the house. He claims that all the evidence seized was the fruit of the initial illegal search.

In his brief, Frierson only complains that police conduct violated his United States Constitutional rights under the Fourth Amendment. We will only address federal constitutional grounds and not state constitutional grounds. *See Heitman v. State*, 815 S.W.2d 681, 690–91 n. 23 (Tex.Crim. App.1991).

At a suppression hearing, the trial court is the sole trier of fact. The court judges the witnesses' credibility and the weight of their testimony. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990). This Court determines whether the record supports the trial court's findings and whether the trial court properly applied the law to the facts. If the record supports the trial court's findings, we may not disturb them. *See id.*

Searches and seizures without a warrant are presumed to be unreasonable. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973); U.S. CONST. amend IV; *Kolb v. State*, 532 S.W.2d 87, 80 (Tex.Crim.App. 1976). A search without a warrant and without probable cause is proper if consent has been voluntarily and freely given. Any person who has joint control or access over property or other sufficient relationship to the property can validly consent to a search. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *Swinney v. State*, 529 S.W.2d 70, 71 (Tex.Crim.App.1975); *Willard v.*

*State*, 682 S.W.2d 686, 691 (Tex.App.— Houston [1st Dist.] 1984), *rev'd on other grounds*, 719 S.W.2d 595 (Tex.Crim.App. 1986). The State bears the burden of proving that consent was voluntary. *Kolb*, 532 S.W.2d at 90. Mere submission to an officer's claim of lawful authority is not effective consent. *Juarez v. State*, 758 S.W.2d 772, 775 (Tex.Crim.App.1988); *Kolb*, 532 S.W.2d at 90. We determine whether the consent was voluntary from the totality of the circumstances. *See Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. at 2058–59.

■ Several factors are to be examined in order to determine whether an appellant freely and voluntarily consented: (1) whether, and to what extent, officers exhibited a show of force, including a display of weapons; (2) whether the actions of the arresting officers can be classified as flagrant misconduct; (3) whether the police threatened to obtain a search warrant if the detainee did not acquiesce, or whether the police claimed a right to search; (4) whether police first gave appellant his *Miranda* warnings; (5) whether the arrest was made in order to obtain consent; (6) whether appellant knew that he could refuse to allow a search; (7) whether consent was first offered by appellant or was in response to police request; (8) appellant's education, intelligence, and physical condition; and (9) the proximity of the consent to the arrest, since an intervening time period can provide a degree of attenuation of the taint. *Fontenot v. State*, 792 S.W.2d 250, 253–254 (Tex.App.—Dallas 1990, no pet.).

Officer Brantley asked to see the gun that Frierson fired at the robbers. Frierson agreed to get it for him. The officers had not arrested Frierson at this point. They were there to investigate a crime against Frierson. Officer Brantley saw Stephen come out of the house. Frierson at first told his son to "go get the—I'll get it for you." Stephen then said "[d]on't worry about it, Dad. I'll show him."

Frierson did not object to this suggestion. Frierson did not say or do anything that indicated that Stephen did not have the right to give consent to the police officer or

that Frierson revoked his son's consent to enter the house. Based on the totality of the circumstances, we conclude that Officer Brantley could have reasonably believed that Stephen consented to his entry into the house.

The trial court properly overruled Frierson's motion to suppress. The trial court did not err by allowing into the evidence the marijuana found in Frierson's house. We overrule Frierson's sixth point of error.

### Scope of the Warrant

In his seventh point of error, Frierson asserts that the trial court erred in not granting his motion to suppress because the seizure of the MDMA exceeded the scope of the warrant. Frierson argues that since the MDMA was not specifically mentioned in the warrant, the officers exceeded the scope of their authority. The State responds that Frierson failed to preserve this error for our review because his only complaint during the motion to suppress was about the initial warrantless search that revealed the marijuana. *See McCombs v. State,* 678 S.W.2d 715, 719 (Tex.App.—Austin 1984, pet. ref'd).

A general or imprecise specific objection is not sufficient to preserve error for appeal, unless the grounds of the objection are obvious to the court and opposing counsel. *Eisenhauer v. State,* 754 S.W.2d 159, 161 (Tex.Crim.App.), *cert. denied,* 488 U.S. 848, 109 S.Ct. 127, 102 L.Ed.2d 101 (1988). The motion to suppress only raised the constitutionality of Officer Brantley's initial entry into the house. At the suppression hearing, the trial court only heard evidence about this issue and denied the motion on that ground. It is not apparent from the record or counsel's objection at trial that Frierson also contested the scope of authority under the warrant. Frierson did not preserve his right to complain on appeal about the scope of the officers' search under the search warrant. We overrule Frierson's seventh point of error.

### BATSON CHALLENGE

In his eighth point of error, Frierson asserts that the State exercised its peremptory strikes in a racially discriminatory manner in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Frierson, a white male, argues that the State, by striking four out of nine prospective jurors belonging to ethnic minorities, exercised its strikes in a racially discriminatory manner.

Under *Batson,* a criminal defendant may raise an equal protection challenge to the use of peremptory challenges at his trial by showing that the prosecutor used them for the purpose of excluding members of the defendant's own race. *Batson v. Kentucky,* 476 U.S. 79, 96, 106 S.Ct. 1712, 1722–23, 90 L.Ed.2d 69 (1986). However, the Supreme Court recently extended *Batson's* scope. Under *Powers v. Ohio,* a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excused juror are the same race. *Powers v. Ohio,* —— U.S. ——, ——, 111 S.Ct. 1364, 1373, 113 L.Ed.2d 411 (1991). Although racial identity between the objecting defendant and the excused juror is appropriate in discerning bias in some cases, it does not constitute a relevant precondition for a *Batson* challenge. *Id.*

In those cases where racial identity between the two parties is not present, a criminal defendant may still challenge the use of peremptories at his trial, but does so on behalf of a third party. The third party is the excluded juror. *Id.* The criminal defendant must show (1) that he has suffered a concrete, redressable injury; (2) that he has a close relation with the third party; and (3) that there exists some hindrance to the third party's ability to protect his or her own interests. *Id.* —— U.S. at ——, 111 S.Ct. at 1370. Once the defendant either establishes a prima facie case of purposeful discrimination or establishes third-party standing to raise race-based exclusions, the burden shifts to the State to come forward with a race-neutral explanation for challenging the excluded potential juror. *Batson,* 476 U.S. at 98, 106 S.Ct. at 1723–24. Upon a showing by the State of genuine race-neutral explana-

tions for use of its peremptory challenges, the defendant may offer evidence to show that the prosecutor's reasons are merely a sham or pretext. *Keeton v. State,* 749 S.W.2d 861, 868 (Tex.Crim.App.1988) (*Keeton II*).

In reviewing the findings of the trial court on *Batson* issues, this Court follows the clearly erroneous standard. We analyze the decision of the trial court by reviewing the record in its entirety by considering the voir dire process including the racial make-up of the venire, the prosecutor's explanations, and the defendant's rebuttal and impeachment evidence. *Whitsey v. State,* 796 S.W.2d 707, 726 (Tex. Crim.App.1990) (op. on reh'g). A finding remains clearly erroneous, even though evidence exists to support it, if a review of the entire record leaves the reviewing court with the definite and firm conviction that the trial court committed a mistake. *Id.* at 721. This Court examines the record in the light most favorable to the trial court's rulings. *Williams v. State,* 804 S.W.2d 95, 101 (Tex.Crim.App.1991). We determine whether the race-neutral reason provided by the prosecutor is supported by the record and whether the appellant introduced sufficient evidence to rebut the prosecutor's explanations so that this Court can rationally infer that he engaged in purposeful racial discrimination. *Id.* at 102. We must evaluate the trial court's findings with regard to each minority person struck because *Batson* prohibits the use of even one purely racially motivated strike. *Whitsey,* 796 S.W.2d at 727.

After voir dire, the trial court took judicial notice of the voir dire and that Frierson was a white male, and accepted into evidence a copy of the jury list, including the juror cards. The court did not feel that Frierson made a prima facie case for a *Batson* hearing, but allowed Frierson to call the prosecutor to explain its four strikes used on minority jurors. After the *Batson* hearing, the court made the following ruling:

> The Court has considered the facts and circumstances and argument and the Court denies the Defendant's request to take any action to change the constitution of the jury. The Court would find that there are neutral explanations for the State's strikes; that the Defendant is a white male and *finds that the Defendant has now met its burden of proof in showing, first of all, that there's a prima facie case. If you assume that there is a prima facie case, which I don't assume, but just for the purpose of establishing your record,* I find that the State has not committed error and will call in the panel.

(Emphasis added.) The State, in its brief, suggests that the trial court actually said "the Defendant has *not* met its burden of proof in showing, first of all, that there is a prima facie case." Regardless of the confusion caused by the trial court's ruling, the court did allow the *Batson* hearing. We assume, for argument's sake, that Frierson made a prima facie case that required the State to explain its peremptory strikes used on minority members of the jury panel.

After the hearing, Frierson's counsel argued that the State used forty percent of its peremptory strikes on racial minorities and had failed to offer adequate explanations for them. In his point of error, he requests that we review the strikes cumulatively instead of by racial group. The jury cards show that the reachable portion of the jury panel contained nine members of recognized minority groups—seven blacks and two hispanics. The State struck one hispanic and Frierson struck the other. The State struck three blacks and Frierson struck one.

During the hearing, the State offered the following explanations for its strikes:

(1) John Biley: Biley had been charged with assault and was awaiting trial in Dallas County. In rebuttal, Frierson's attorney established that the State did not question Biley about the assault charge. This is a sufficiently race-neutral reason for striking this potential juror. *Yarbough v. State,* 732 S.W.2d 86, 90 (Tex.App.—Dallas 1987), *rev'd on other grounds,* 761 S.W.2d 18 (Tex.Crim.App.1988).

(2) Timothy Rios: The prosecutor struck Rios because he was non-responsive during voir dire, he was young, had no children, and lived in a high crime area for drug-related offenses. Frierson's counsel noted that three white jurors were also inattentive. The records show that the State used a peremptory strike on one of these jurors and that the court excused the other two for cause. In rebuttal, Frierson's counsel established that there were six other jurors around the same age as Rios and that the prosecutor did not strike any of them. The prosecutor never questioned Rios directly on any subject. Rios is a sixteen-year employee of the City of Dallas and has no criminal record.

Each of the explanations given by the State can be race-neutral if applied to the jury panel as a whole. *See Keeton*, 749 S.W.2d at 868–69; *C.E.J. v. State*, 788 S.W.2d 849, 856 (Tex.App.—Dallas 1990, writ denied). In *C.E.J.*, this Court noted that a prosecutor's claim of a juror's inattentiveness as an explanation can be a sham and requires close scrutiny by the trial court. *See C.E.J.*, 788 S.W.2d at 857–58. Frierson's counsel noted three white inattentive jurors. When questioned by Frierson's counsel, the prosecutor recalled that she had used a peremptory challenge on one white inattentive juror. She also recalled that she did not need to use a peremptory strike on another inattentive white juror because the court had already excused that juror for cause. The third inattentive white juror had also been excused for cause. Rios's inattentiveness coupled with the other reasons cited by the prosecutor is sufficient to constitute a race-neutral explanation in this case. The only other hispanic would have served on the jury if Frierson's counsel had not struck him.

(3) Ruth Crittendon: Crittendon is a switchboard operator for Baylor Hospital. The prosecutor said that she struck Crittendon because of her medical background. The prosecutor stated that she had problems with medical people in drug cases. The prosecutor did not question her about her position at Baylor Hospital. The prosecutor testified that Crittendon had also been inattentive during voir dire and seemed to have no desire to be there. Employment can be a race-neutral reason. *See United States v. Dela Rosa*, 911 F.2d 985, 991 (5th Cir.1990) (prosecutor believed woman who worked with church-affiliated agency would tend to side with the defendants). As previously discussed, the record shows that the prosecutor noted inattentive jurors and used that factor in considering her peremptory strikes regardless of race.

(4) Larry Jackson: Jackson had previously served on a civil jury that resulted in a hung jury. The prosecutor had concerns about him being able to reach a verdict with other jurors. This is a sufficiently race-neutral explanation. *See Woods v. State*, 801 S.W.2d 932, 940 (Tex.App.—Austin 1990, pet. ref'd).

The State offered race-neutral explanations that were not rebutted by Frierson's counsel. The trial court accepted the State's explanations at the conclusion of the hearing. If Frierson had not exercised any of its strikes against recognized minorities, the panel composition would have been four blacks, one hispanic, and seven whites. From the record before us, we cannot rationally infer that the prosecutor engaged in purposeful discrimination. The trial court's acceptance of the State's explanations is not clearly erroneous under the facts in this case. We overrule Frierson's eighth point of error.

We affirm the trial court's judgment.