Alegria v. State 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-93-018-CR

        ANDREW ALEGRIA,
                                                                                       Appellant
        v.

        THE STATE OF TEXAS,
                                                                                       Appellee
 

From the 82nd District Court
Robertson County, Texas
Trial Court # 91-12-14,901-CR
                                                                                                    

O P I N I O N
                                                                                                    

          Appellant was indicted and tried for capital murder in the shooting deaths of his ex-wife,
Tia Alegria, and Clarence Martin. See Tex. Penal Code Ann. § 19.03 (Vernon Supp. 1994). 
He was convicted of the murder of Tia Alegria and the voluntary manslaughter of Martin,
receiving a life sentence for the former and twenty years for the latter. See id. §§ 19.02, 19.04.
          In eight points of error Alegria argues: the affidavit in support of his arrest warrant was
deficient; the search of his room at his parents' home after his arrest was without a warrant and
without consent; his confession was not voluntarily given; the trial court erred in overruling his
challenge for cause of venireperson Walston because she could not consider life imprisonment as
a punishment for capital murder; the trial court erred in granting the state's challenges for cause
of venirepersons Schultz and Barker because they both indicated they could, despite the state's
assertions, consider death as a punishment for capital murder; the trial court erred in overruling
his challenge for cause of venireperson Oliver because he could not consider probation as possible
punishment either for murder or voluntary manslaughter; and the trial court erred in overruling
his objection to the testimony of Judith Martin during the punishment phase of the trial. We
affirm. 
                    I. Background
          Alegria and Tia had a stormy relationship. The couple met in 1989 and began dating at
that time. While they were dating, Tia became pregnant with a child Alegria presumed was his,
but, as Alegria later learned, may have been fathered by another man. They married on
November 26, 1989, and the child, Andrew Alegria, Jr., was born two months later. Their
married life together was beset by arguments, threats, physical abuse, and affairs. Tia had
adulterous affairs with at least two men, Clarence Martin and Brandon Meadows. Although they
separated in January 1991 and were divorced the following July, Alegria continued to in live her
parents' house in Dallas, where Tia also stayed at various intervals, these intervals overlapping
on at least some occasions.
          At some point in time, Alegria learned of Tia's marital infidelity. Nevertheless, he
harbored hopes of a reconciliation. He continued to harbor these hopes until November 7, 1991. 
During the early morning hours of November 7 he left his home in Dallas to spend a weekend at
his parents' house in Hearne. After spending the day visiting his parents and his cousin, he left
at approximately 9:30 p.m. to pick up the child, Alegria, Jr., at Tia's parents' second home near
Hearne. When he arrived he noticed an older model tan Pontiac Grand Prix parked near the home
and was told by someone that the car belonged to Clarence Martin. When he saw Tia, she asked
him why he had come. He replied that he came to pick up the child. Alegria then asked why
Clarence was there with her. An argument then followed concerning the purpose of Clarence's
visit and whether Tia was going to mention his visit to her boyfriend in Dallas, Raymond
Anderson.
          Alegria followed Tia and Clarence to a convenience store in Hearne where he and Clarence
both expressed to each other their continued affection for Tia. Clarence then invited Alegria to
follow them to a party in Bremond, which he did. While they were travelling, Alegria noticed that
the child's diaper needed to be changed, so he flashed Clarence, who was driving the Pontiac, so
they could pull over and wait for him while he changed it.
          When Clarence and Tia exited the Pontiac, Alegria explained to them the reason for the
stop. Tia became angry and a bitter argument ensued between her and Alegria over their
relationship. Alegria then retrieved a .357 Smith & Wesson revolver from his car and told Tia
that that was how she made him feel from all the years that she hurt them. He shot at Tia
approximately three times and at Clarence approximately two times. They jumped into the Pontiac
as quickly as they could to escape. Alegria chased after them and put some shells in his shirt
pocket in the process. After travelling some distance, the Pontiac caromed off a guard rail, veered
off the side of the road, and came to a halt.
          Alegria then parked his car nearby the Pontiac. He reloaded his revolver and walked
around the passenger side of the car and fired six shots at both Clarence and Tia. He reloaded and
then fired six more shots at them, whereupon he ran back to his car and fled the scene.
          II. Whether Alegria's Arrest Was Illegal
          Alegria in his first point asserts his arrest was unlawful because the affidavit supporting
the issuance of his arrest warrant did not establish probable cause of his guilt. We disagree.
          Alegria directs his attack at several targets. He assails the credibility of the issuing
magistrate, Justice of the Peace Joe Y. McNutt, and of the affiant, Deputy Ron Garney of the
Robertson County Sheriff's Department; and he charges that the hearsay statements included in
Garney's affidavit are unreliable as a matter of law because Garney failed to vouch for the
credibility of the declarants.
          On November 9, 1991, Ron Garney of the Robertson County Sheriff's Department sought
to present to Judge McNutt two documents to support his belief in Alegria's guilt—an affidavit
listing the facts he discovered through his investigation and an accompanying statement by Roger
Townley, Jr., Tia's brother, describing an argument he heard on the day of the homicides between
Alegria and Tia in which Alegria stated that he ought to shoot Clarence.
          At the hearing on the motion to suppress, Judge McNutt had difficulty offering consistent
testimony on whether Townley's statement was presented to him by Garney and, if so, whether
he read it before issuing the warrant. Furthermore, when asked about the particular circumstances
surrounding the issuance of the warrant, both Garney and Judge McNutt were frequently unable
to recall specific facts. Their persistent failure to recollect events adequately, argues Alegria,
evinces an unwillingness to relate the true facts to the trial court despite their ability to do so.
          However, the trial court could have found Judge McNutt's consistent and unwavering
testimony on the presence of and his attention to Garney's affidavit established that he did read
the affidavit, and Garney's affidavit reveals at least the minimum amount of suspicion necessary
to support the trial court's finding of probable cause.
          Garney's affidavit set forth the following relevant facts: On November 8, 1991, at
approximately 11:49 p.m., Garney, a licensed peace officer in Texas for three and one-half years,
received a call to go about two miles north of Calvert on Highway 6 and north of Walnut Creek
in Robertson County. At the scene, Garney witnessed a two-door tan car on the west side of the
highway near a barbed wire fence. Inside the car Garney found the bodies of Martin and Tia, both
covered with blood having suffered multiple gunshot wounds.
          Upon further examination, Garney observed broken out windows on the back and the
passenger side of the car, streaks of blood on the outside of the car suggesting that the car had
been in motion, and smeared blood on the trunk. Garney observed on the shoulder of the highway
six spent .38 calibre shell casings and blood near them. He also found a damaged guard rail less
than a mile from the location of the car and scrape marks on the driver's side of the car that
appeared to have been caused by contact with the guard rail.
          Vern Bennett, a private citizen, told Garney that at approximately 11:45 p.m. on November
8 he saw two two-door cars travelling south-bound on Highway 6 that appeared to be racing.
          Later in the investigation, Garney was informed by several other peace officers that twelve
more spent .38 calibre shell casings were found near the car.
          On November 9, Robertson County Deputy Bobby Mathis relayed to Garney a statement
from Roger Townley, Jr. that, on the night of the homicides, Alegria made a statement to the
effect that he ought to shoot Martin.



          Also on November 9 Roger Townley, Sr., Tia's father, told Garney that Alegria owned
a .38 Special; that Alegria worked as a security guard in Dallas; that Alegria and Tia, once
married, were separated two to three months earlier; that Tia ended her relationship with Alegria
because he beat her; and Alegria owned a two-door automobile. Tia's sister also told Garney that
Alegria had previously tried to smother Tia with a pillow. 
          The standard of review governing a trial court's ruling on a motion to suppress is whether
the court clearly abused its discretion. Maddox v. State, 682 S.W.2d 563, 564 (Tex. Crim. App.
1985); Byrd v. State, 835 S.W.2d 223, 226 (Tex. App.—Waco 1992, no pet.). Because the trial
court is the sole trier of fact at a hearing on a motion to suppress, any finding supported by the
record will not be disturbed. Byrd, 835 S.W.2d at 226; Johnson v. State, 834 S.W.2d 121, 122-123 (Tex. App.—Houston [1st. Dist.] 1992, pet. ref'd). The totality of the circumstances are to
be considered in determining whether probable cause exists for the issuance of a warrant, whether
it be for an arrest or a search. See Johnson v. State, 803 S.W.2d 272, 289 (Tex. Crim. App.
1990), cert. denied, -- U.S. --, 111 S.Ct. 2914 (1991), overruled on other grounds by Heitman
v. State, 815 S.W.2d 681, 685 n. 6 (Tex. Crim. App. 1991).
          The record in the instant case supports the court's finding of probable cause in Garney's
affidavit. Given the inconsistency in Judge McNutt's testimony on whether he considered
Townley's statement in issuing the arrest warrant, the trial court could have reasonably ignored
the statement and found probable cause of Alegria's guilt in Garney's affidavit alone. 
          Alegria charges that Garney's affidavit is unreliable as a matter of law because Garney
failed to vouch for the credibility of the declarants of the hearsay statements he included. See
Aguilar v. Texas, 378 U.S. 108, 114-115, 84 S.Ct. 1509, 1514 (1964) (hearsay statements by
unnamed informants included in a presenting affidavit cannot be considered reliable unless the
credibility of the declarant is vouched for). However, all of the hearsay statements included by
Garney were made either by peace officers or private individuals whom Garney named in the
affidavit, not by unnamed informants. Peace officers and named individuals are presumed to be
reliable. Marquez v. State, 725 S.W.2d 217, 233 (Tex. Crim. App. 1987). Accordingly, without
any evidence that the declarants of the hearsay statements in Garney's affidavit were not credible,
we conclude the court did not err in considering the hearsay statements. Because the trial court
could reasonably have found probable cause in Garney's affidavit alone, Alegria's first point is
overruled.
                    III. Whether Alegria's Consent to Search His Room Was Voluntary

          Alegria asserts in his second point that the search of his room at his parents' house
following his arrest was unlawful because it was made without a warrant and without his voluntary
consent. He contests the admission of the gun, some ammunition, and the gun holster, all found
in a chest drawer in his room.
          The following events took place on November 9, 1991, the date of Alegria's arrest: After
obtaining a warrant for Alegria's arrest from Judge McNutt at approximately 10:42 a.m., Garney,
Robertson County Sheriff Lee Scott Hurley, and Texas Ranger Bob Connell went to Alegria's
parents' house in Hearne to execute the warrant. No search warrant was issued at this time or at
any other time in relation to this case.
          Garney believed Alegria was present in the house because Townley, Sr. told him Alegria
stayed at his parents' house when he was not at home in Dallas; Hearne police officers had notified
Garney that Alegria's car was parked at his parents' house during the morning of November 9;
and Garney had been told that Alegria, when he picked up Alegria, Jr. from Tia, would take him
to his parents' house.
          Garney and Connell arrived at the house and, with guns drawn, knocked on the front door. 
Alegria's mother, holding a baby, answered the door. Garney identified himself as the "Sheriff's
Department" and asked if Alegria was in the house. Alegria's mother responded by repeating
several times, "Please don't hurt him," and by saying, "There's a baby in the house." She also
looked over her shoulder a number of times.
          From the information Garney had previously received that Alegria was in the house
combined with the manner in which Alegria's mother was acting, Garney concluded Alegria was
present in the house and decided that he and Connell would enter. They walked through the front
door and into the living room. Neither Garney nor Connell received permission from anyone to
enter the house.
          At about the same time, Alegria entered the living room from a room in the back of the
house. When he entered, he turned to his mother and said, "This is for the best." Garney asked
him if he was Alegria, and he responded in the affirmative. After being instructed by Garney to
lie on the floor, Alegria complied. Garney then put his gun in his belt behind his back, handcuffed
Alegria, told him that he possessed a warrant for his arrest, and informed him that he was under
arrest.
          After the arrest, Garney lead Alegria to the front yard of the house, read him his statutory
Miranda warnings, and asked him where the gun was that he used to kill Clarence and Tia. See
Miranda v. Arizona, 384 U.S. 436, 85 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Tex. Crim. Proc.
Ann. art. 38.22, § 2(a) (Vernon 1979). Alegria replied, "The gun is in my room." Garney asked
where in the room. Alegria said it was in the top drawer of the chest. Garney asked if Alegria
would show him, and Alegria led Garney into the bedroom and indicated toward the chest. 
Garney opened the drawer and found a loaded stainless steel revolver, four boxes of ammunition,
and a gun holster. Alegria was taken back outside and one of the other peace officers present
asked him if the revolver Garney found was the one he used. Alegria said that it was. Alegria
also indicated that he used the red box of ammunition found in the drawer.
          Approximately 40 minutes after Garney arrived at the house, Alegria, while outside, signed
a form indicating his consent to search the house and his car. In signing the form, he
acknowledged that he was not being threatened by the peace officers and he was not being
promised anything. Neither of Alegria's parents ever gave consent for the officers to search
anywhere in the house.
          Alegria was transported to the Robertson County Jail where Garney began to interrogate
him at approximately 2:51 p.m. Garney again informed him of his statutory Miranda warnings,
asked him specifically if he wanted an attorney, and stated that he could be facing capital murder
charges. Notwithstanding Garney's warnings, Alegria agreed to make a confession, which he
dictated to Garney, who copied it verbatim.
          At trial, the gun, the ammunition from both the chest drawer and the car, and the holster
were admitted into evidence.
          One of the specifically established exceptions to the state and federal constitutional
requirements of both a warrant and probable cause to a lawful search is a search conducted
pursuant to consent. Juarez v. State, 758 S.W.2d 772, 775 (Tex. Crim. App. 1988) (quoting Kolb
v. State, 532 S.W.2d 87, 89 (Tex. Crim. App. 1976)). When the state, however, attempts to
introduce into evidence objects seized after an apparently consensual warrantless search, it bears
the burden of proving the voluntariness of the search by clear and convincing evidence. Meeks
v. State, 692 S.W.2d 504, 509 (Tex. Crim. App. 1985). This burden requires the state to prove
the consent was positive, unequivocal, and not the product of either coercion or duress, actual or
implied. Juarez, 758 S.W.2d at 775. The state must show the consent was truly voluntary and
not merely an acquiescence to authority. Meeks, 692 S.W.2d at 509. 
          The question of whether a consent to search was voluntary is a question of fact to be
determined from the totality of the circumstances. Id. at 510. As mentioned above, the trial judge
in a suppression hearing is the sole and exclusive trier of fact and judge of the credibility of the
witnesses as well as the weight to be given to their testimony, and its findings will not be disturbed
absent a clear abuse of discretion. Byrd, 835 S.W.2d at 226.
          Several factors will assist our analysis of the totality of the circumstances: (1) whether and
to what extent the officers exhibited a show of force, including the display of weapons; (2)
whether the actions of the arresting officers can be classified as flagrant misconduct; (3) whether
the police threatened to obtain a search warrant if Alegria did not acquiesce to their request for
consent to search, or whether the police claimed a right to search; (4) whether the officers first
gave Alegria his Miranda warnings; (5) whether the arrest was made in order to obtain consent;
(6) whether Alegria knew that he could refuse to allow a search; (7) whether consent was first
offered by Alegria or whether or was in response to the officers' request; (8) Alegria's education,
intelligence, and physical condition; and (9) the temporal proximity of the consent to the arrest. 
See Frierson v. State, 839 S.W.2d 841, 851 (Tex. App.—Dallas 1992, pet. ref'd).
          In considering all these factors, we conclude the court did not err in overruling Alegria's
motion to suppress. When Garney and Connell arrived at the front door of Alegria's parents'
house, they indeed had their guns drawn. Alegria, however, was not present in the living room
when the officers entered the house. While the arrest was being made, Garney ordered Alegria
to lie on the living room floor, which he did. Once Alegria was on the floor, Garney stuffed his
gun under his belt behind his back and handcuffed him. Alegria was asked about the location of
the gun after he was helped back on his feet by Garney. The Dallas Court of Appeals, in a similar
fact situation, found that the presence of peace officers with guns drawn while arresting a suspect
will certainly influence the suspect to submit to the will of the officers, but the reholstering of the
firearms mitigates the resulting level of coercion. See Vasquez v. State, 804 S.W.2d 606, 611
(Tex. App.—Dallas 1991, no pet.).
          The Vasquez Court also addressed the issue of consent being given while the suspect is
under arrest. The Court wrote:
Although the fact of arrest is a factor militating against a finding of consent because
after arrest a subject is more susceptible to possible duress or coercion, the
question is whether the officers used coercive tactics or took unlawful advantage
of the arrest situation to obtain the consent. The absence of intimidation, threats,
abuse (physical or psychological), or other coercion is a circumstance weighing in
favor of upholding what appears to be a voluntary consent. On appeal, the court
should not disturb the trial court's finding of voluntariness unless it appears that the
defendant's consent was physically or mentally coerced by the actions of the
arresting officers that went beyond the normal duress inherent in any arrest.
 
Id. at 611. Here, all guns were holstered at the time the consent was given. Undoubtedly, the
presence of the several officers could have intimidated Alegria, but the record from the
suppression hearing reveals no misconduct, duress, or coercion on the part of the officers.
          Another important mitigating factor is that Alegria was read his statutory Miranda rights
before his consent to search was sought. See Juarez, 758 S.W.2d at 781. The court could have
reasonably found that the reading of the warnings greatly lessened any coercive effect by the
presence of the officers.
          Neither Garney nor any other officer warned Alegria that a search warrant would be
obtained if he refused to consent. Furthermore, Garney testified that the arrest was not made for
the purpose of being able to conduct a search. Indeed, the record suggests the officers were
primarily interested in capturing a suspected murderer whom they believed to be dangerous.
          There is no evidence that the officers advised Alegria of his right to refuse to consent;
however, police need not inform an accused of his right to refuse for the consent to search to be
voluntary and valid. See Meeks, 692 S.W.2d at 510. The testimony from the suppression hearing
indicates that Garney knew Alegria was employed as a security guard. Nothing indicates that he
is an unintelligent person or had a deficient education. The arrest took place at around 11:10
a.m., the morning after the offense, not during the middle of the night. There is no evidence that
he was abused, either physically or psychologically.
          The consent, given in response to an inquiry by Garney, was given approximately forty
minutes after the arrest was made. The Frierson court indicated that a long period of time between
the arrest and the consent can provide a degree of attenuation of the taint. Frierson, 839 S.W.2d
at 851. However, when this period of time covers a number of hours, it can intensify the coercive
atmosphere. See Juarez, 758 S.W.2d at 781-782. The forty minutes could very well have
provided Alegria with an opportunity to reflect upon the implications of the officers' request
instead of being an automatic acquiescence to authority, which is often the case when a request
to search is made immediately following an arrest. While the fact that the consent was in response
to an inquiry by Garney and not given spontaneously by Alegria is a factor tending toward
coercion, we find Garney posed the question in the least coercive way possible.
          Considering the totality of the circumstances, we conclude the trial court did not abuse its
discretion in finding that Alegria's consent to search his room and his car was voluntarily given. 
His second point is overruled.
                    IV.     Whether Alegria's Confession Was Voluntary
          In his third point Alegria asserts the trial court erred in allowing his confession into
evidence because it was a fruit of his illegal arrest. We, however, have already determined that
the arrest was lawful. His third point is, therefore, overruled.
                    V.      Whether Venireperson Walston Should Have Been Excused For
                              Cause

          In his fourth point, Alegria asserts venireperson Walston was prejudiced against him
because she, during voir dire, stated the death penalty should invariably be ordered in all capital
murder cases.
          Before an appellant can obtain a reversal based on the trial court's erroneous denial of his
valid challenge for cause, the appellant must show that he was in some way harmed by the trial
court's action. Narvaiz v. State, 840 S.W.2d 415, 427 (Tex. Crim. App. 1992), cert. denied, --
U.S. --, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). Alegria was not harmed by the action of the
trial court; he was sentenced to life in prison, not death. See Buffington v. State, 801 S.W.2d 151,
157 (Tex. App.—San Antonio 1990, pet. ref'd), cert. denied, -- U.S. --, 112 S.Ct. 218 (1991). 
Therefore, his fourth point is overruled. 
                    VI.     Whether Venireperson Oliver Should Have Been Excused for
                              Cause

          In his sixth point Alegria complains the trial court erred in failing to excuse venireperson
Donald Ray Oliver for cause because he was unable to consider probation as a possible punishment
either for murder or voluntary manslaughter, and, therefore, had a bias or prejudice against a
portion of the law. See Tex. Code Crim. Proc. Ann. art. 36.16(c)(2) (Vernon Supp. 1995). We
disagree.
          During the state's initial questioning of Oliver during voir dire, he stated that he could
consider probation as a possible punishment for both murder and voluntary manslaughter. The
following testimony occurred when the defense took Oliver on voir dire:
[Defense]: Are you telling me that in a situation where you have found someone
guilty of murder that you can give fair consideration to probation as a possible
punishment for murder?
 
[Oliver]: No, I cannot.
 
[Defense]: All right, now voluntary manslaughter. It carries with it a punishment
range of two to twenty.... Likewise, probation is a possible punishment, two years
[of] probation for voluntary manslaughter. Can you give fair consideration to that
possible punishment?
 
[Oliver]: No.
 
          The state then attempted to rehabilitate Oliver by asking him if he could find probation a
suitable punishment under various circumstances; specifically, the state suggested a scenario where
an elderly woman decided to kill her ailing elderly husband by lethal injection and then made
reference to other possible situations where a murder defendant would not be likely to murder
again. The state further explained that the Texas legislature purposely provides juries with a wide
range of punishment, including five years of probation as a minimum, for murder to account for
the various circumstances under which a murder may be committed.
          The following testimony resulted after the state's attempts at rehabilitation:
[State]: Could you consider [giving probation] if you thought the facts and
circumstances of the case warranted it? ...
 
[Oliver]: Well, I believe I could. I think I could give probation. Like he (the
state) said, depending on the case itself....
 
[Court]: Well, do you have a [built-in] preconceived notion [of] not considering
it at all?
 
[Oliver]: No, not really, I don't think, and that was what he (the state) was asking. 
That is the only answer that I can give you. I don't know. I don't know what you
all are looking for, but that's the way I feel.
 
[Court]: We are not looking for anything. We are just looking to see how you feel
and I have to make the call up here....
 
[Oliver]: Like I said, I could do probation. It depends on the case.
 
[Court]: We are not asking you if you could give it. Would you consider it ... in
a case ... as a punishment?
 
...
 
[Oliver]: Yes, I could since I understand it a little better, I think.
 
          The defense then inquired of Oliver why he had changed his testimony twice. Oliver
responded that he understood the nature of the questioning better. When the defense renewed its
challenge for cause, the court denied it, causing the defense to use one of its peremptory strikes.
          A venireperson who demonstrates an inability to consider the full range of punishment is
subject to challenge for cause. Williams v. State, 773 S.W.2d 525, 536 (Tex. Crim. App. 1988). 
A trial court's refusal to sustain a defendant's challenge for cause will be reviewed in light of all
the prospective juror's answers. Id. at 537. The grant or denial of a challenge for cause is within
the trial court's discretion and will not be disturbed on appeal absent an abuse of that discretion. 
Adanandus v. State, 866 S.W.2d 210, 222 (Tex. Crim. App. 1993), cert. denied, -- U.S. --, 114
S.Ct. 1338 (1994).
          The court could have, within its discretion, found that Oliver, when he initially indicated
that he could not consider probation as a punishment either for murder or voluntary manslaughter,
failed to consider the many various circumstances under which they could be committed that would
justify the imposition of a probated sentence instead of jail time. As we conclude the trial court
did not abuse its discretion in denying the defense's challenge for cause of Oliver, Alegria's sixth
point is overruled. 
                    VII.    Whether the Trial Court Erred in Excusing Venirepersons
                              Schultz and Barker For Cause

          In his fifth and seventh points, Alegria argues the trial court erred in excusing
venirepersons Schultz and Barker. He argues that both Schultz and Barker were erroneously
excused under Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844 (1985). Any error a trial court
makes under Wainwright in excusing a potential juror is rendered harmless when the death penalty
is not imposed. See Buffington, 801 S.W.2d at 157. Therefore, Alegria's fifth and seventh points
are overruled.
                    VIII.   Whether the Trial Court Erred in Overruling Alegria's
                              Objection to the Testimony of Judith Martin at the Punishment
                              Phase of the Trial

          In his eight point of error Alegria argues the trial court erred in overruling his objection
to the testimony of Judith Martin, Clarence Martin's mother, at the punishment phase of the trial. 
We disagree.
          Victim impact evidence is admissible as a circumstance of the offense so long as that
evidence has some bearing on the defendant's personal responsibility and moral guilt. Tex. Crim.
Proc. Ann. art 37.07, § 3(a) (Vernon Supp. 1995); Stavinoha v. State, 808 S.W.2d 76, 79 (Tex.
Crim. App. 1991) (citing Miller-El v. State, 782 S.W.2d 892, 896 (Tex. Crim. App. 1990).
          Alegria advances a discussion of both Stavinoha and Miller-El for his argument that Judith
Martin's testimony was inadmissible, although in each of these case the Court of Criminal Appeals
found the disputed testimony to be admissible during the punishment phase.
          In Stavinoha, the minor victim's mother was permitted to testify about the psychological
impact the defendant's sexual abuse had on both her and her son. The Stavinoha court wrote that,
because the defendant knew the victim and his mother and cultivated a relationship of trust with
them only to exploit that trust in his effort to assault the victim sexually, the defendant could easily
have anticipated the psychological damage done to both the victim and his mother. Stavinoha, 808
S.W.2d at 79. Therefore, held the court, the testimony by the mother on the psychological
damage done both to her and the child bore upon the defendant's personal responsibility and his
moral guilt. Id. at 79.
          In Miller-El, the Court of Criminal Appeals permitted a physician to testify during the
punishment phase of a murder trial on the physical hardships the victim would encounter after
being paralyzed when he was shot by one of the defendant's co-conspirators. Miller-El, 782
S.W.2d at 894-896. The court held that evidence of the extent of the victim's injury was not
relevant to any element of the crimes for which she was charged; however, such evidence was
admissible during the punishment phase. As the court wrote:
It seems clear to us that one "circumstance of the offense" is degree of injury, even
extending into the future, so long as a factfinder may rationally attribute moral
culpability to the accused for the injury.
 
Id. at 896.
          Alegria distinguishes Miller-El on the grounds that the victim was still alive after the
commission of the offense. We agree with Alegria that Miller-El is inapposite, but not for the
reason he provides. Alegria's distinction that the victim in the instant case, namely, Clarence
Martin, died as a result of the offense whereas the victim in Miller-El survived is irrelevant. 
Judith Martin's testimony was offered by the state during the punishment phase to demonstrate to
the jury the emotional and psychological effect the killing of her son had upon her as his mother,
not, obviously, how the victim himself was affected by his own death.
          In Stavinoha the trial court allowed testimony during the punishment phase by a male
victim's mother on the emotional and psychological she, not the victim, suffered as a result of the
crime perpetrated upon her son.


 The victim in Stavinoha was a minor who was sexually molested
by the defendant. The victim here was a twenty-one year old male who lived with both of his
parents and was shot to death by the defendant. The trial court could have reasonably found the
nature of the relationship between the mother and the victim in the instant case to be sufficiently
similar to that of the mother and son in Stavinoha to render the disputed testimony admissible.
          The Stavinoha court appears to restrict the admissibility of the mother's testimony under
the facts that the defendant there developed a friendship and a relationship of trust with the victim
and his mother and, therefore, moral responsibility and personal guilt for the psychological trauma
inflicted upon the mother could be attributed to him. We find this holding can be expanded under
the facts of this case, whether or not Alegria developed a relationship of trust with the deceased's
mother or possessed actual knowledge of her existence. When a defendant takes another person's
life, he can reasonably be expected to anticipate the devastating psychological consequences the
victim's untimely death at his hands will have upon the immediate members of his family. 
Criminal acts, particularly violent criminal acts, do not affect the victim alone. Family and friends
care deeply for the well-being of the victim and when that person is harmed by a criminal act they
may be greatly damaged emotionally. The primary if not exclusive cause of this damage is the
assailant's criminal act, and he is, consequently, personally responsible for and morally guilty of
that damage. At least two other courts of appeal have recently reached this same conclusion. See
Blevins v. State, 884 S.W.2d 219, 231 (Tex. App.—Beaumont 1994, no pet. h.) (mother of
deceased victim permitted at punishment phase to read a Christmas poem she composed for her
son following his death); Peoples v. State, 874 S.W.2d 804, 806-807 (Tex. App.—Fort Worth
1994, pet. ref'd) (murder victim's mother permitted to testify at punishment phase about her
anguished thoughts and feelings as her son died in her arms even though mother was not present
when her son was shot on her front lawn but came out of her house to see him when she heard
gunshots).
          Alegria also argues the trial court erred in failing to conduct a balancing of the probative
value of Judith Martin's testimony against its prejudicial effect under Rule 403 of the Criminal
Rules of Evidence as he had timely requested at trial. See Tex. R. Crim. Evid. 403. The record,
however, indicates that soon after Alegria's request for a Rule 403 balancing, the trial court found
the testimony admissible under Stavinoha. We, accordingly, find that the trial court did conduct
a balancing, although the record does not specifically indicate. Furthermore, after a thorough
review of the record, we conclude the trial court did not abuse its discretion in finding the
testimony admissible during the punishment phase. See Montgomery v. State, 810 S.W.2d 372,
391 (Tex. Crim. App. 1991) (on rehearing). Appellant's eighth point if overruled.      The
judgment is affirmed.
 
                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Chief Justice Thomas,
          Justice Cummings, and
          Justice Vance
Affirmed
Opinion delivered and filed December 21, 1994
Do not publish