Opinion by Justice Moseley
A jury convicted Timothy Parmer of attempted capital murder,[1] resulting in a sentence of life imprisonment and a $10,000.00 fine. Parmer appealed. Because we find that Parmer was prejudiced by his counsel's ineffective assistance, we reverse *726 the trial court's judgment and remand the case for a new trial.[2]
I. Background
Police officers received a distress call March 7, 2010, from Parmer's girlfriend, who reported that Parmer was acting strangely and shooting a gun. Using the cover of darkness, twelve to fourteen police officers descended on Parmer's home to investigate the call and to execute a warrant that had already been issued against him. Christopher Bettis, a Wood County deputy, testified that several officers "walked down the road using the shadows as cover ... to get right up against the residence," removed the lock securing Parmer's gate, and surrounded the property. While he was hidden, Bettis observed Parmer screaming and yelling. According to Bettis, Parmer's "demeanor, the way he was talking, he-he wasn't making any-any sense whatsoever."
Officers decided to terminate the electric power to Parmer's home. Larry Vaughan, a state trooper, testified that he heard two people emerge from the residence after the power was cut. Officers attempted to taze Parmer, but caught his girlfriend instead. Parmer yelled, "Get the 'F' off my property," ran back inside of his home, grabbed a shotgun, and chambered a shell. In order to see into the property, Vaughan shone his flashlight through a window.[3] Parmer shot Vaughan in the face with buckshot. The State charged Parmer with attempted capital murder.[4] See TEX. PENAL CODE ANN . §§ 15.01(a), 19.03(a)(1).
To prove Parmer knew that Vaughan was a peace officer, a required element of the offense, Bettis testified that someone shouted out "the sheriff's office was out here and, you know, that he just needed to *727 come out and talk to us." See TEX. PENAL CODE ANN . § 19.03(a)(1). Bettis also said that officers commanded Parmer to get down on the ground after he initially emerged from the residence. Edward Shadbolt, another officer at the scene, testified that he heard Lieutenant Jerry Blaylock say, "Sheriff's Department. Come on out. Come on out. We need to talk to you." According to Shadbolt, Blaylock's voice was loud enough for someone who was inside of the house to have heard him. Shadbolt testified that he heard Parmer say, "I'm going to show these [MFs]" and "You [Fers] get off my land," before he fired the shot. James White, an officer who was also present during the encounter, testified that no one used a bullhorn and that he did not hear anyone say that they were from the sheriff's office.[5]
Pointing to the facts of the encounter, and the testimony of officers who described Parmer's statements, Parmer argued at trial that he did not intentionally or knowingly attempt to cause Vaughan's death. Instead, even though Parmer did not request the inclusion of any lesser-included offenses, Parmer argued that he only intended to get people off of his property when he shot his weapon. Prior to trial, defense counsel stipulated to the admission of Parmer's medical records. Those records described Parmer's long history of mental illness.[6] However, the records also contained many detailed references to extraneous offenses, prior bad acts, and unpopular views. Yet, Parmer failed to request an extraneous-offense instruction for any offenses that may have been admissible. We now decide whether counsel's failure to object to the extraneous-offense evidence contained in portions of Parmer's medical records, admitted during the guilt/innocence phase of his trial, constituted ineffective assistance.
II. Parmer's Counsel Rendered Ineffective Assistance
A. Standard of Review
In order to prevail on a claim of ineffective assistance of counsel, the defendant must satisfy the two-pronged test set forth in Strickland v. Washington. 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ; see also Ex parte Imoudu , 284 S.W.3d 866, 869 (Tex. Crim. App. 2009) (orig. proceeding). The first prong requires a showing that counsel's performance fell below an objective standard of reasonableness. Strickland , 466 U.S. at 688, 104 S.Ct. 2052. This requirement can be difficult to meet since there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S.Ct. 2052. "This measure of deference, however, must not be watered down into a disguised form of acquiescence." Profitt v. Waldron , 831 F.2d 1245, 1248 (5th Cir. 1987).
Allegations of ineffectiveness "must 'be firmly founded in the record.' " Bone v. State , 77 S.W.3d 828, 835 (Tex. Crim. App. 2002) (quoting Thompson v. State , 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) ). When a claim of ineffective assistance of counsel is raised for the first time on direct appeal, the record "is in almost all cases inadequate to show that counsel's *728 conduct fell below an objectively reasonable standard of performance." Andrews v. State , 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). Nevertheless, "when no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for acting as she did." Id. Essentially, when a party raises an ineffective assistance of counsel claim for the first time on direct appeal, the defendant must show that "under prevailing professional norms," Strickland , 466 U.S. at 690, 104 S.Ct. 2052, no competent attorney would do what trial counsel did or no competent attorney would fail to do what trial counsel failed to do. Andrews , 159 S.W.3d at 102.
Under the second Strickland prong, to which reference is sometimes made as "the prejudice prong," "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Strickland , 466 U.S. at 693, 104 S.Ct. 2052. Yet, "[i]t is not enough for the [appellant] to show that the errors had some conceivable effect on the outcome of the proceeding." Ex parte Varelas , 45 S.W.3d 627, 629 (Tex. Crim. App. 2001) (quoting Strickland , 466 U.S. at 693, 104 S.Ct. 2052 ). Rather, the second prong requires a showing that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. Strickland , 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." Id. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the fact[-]finder would have had a reasonable doubt respecting guilt." Id. at 695, 104 S.Ct. 2052. We examine the second Strickland prong by judging the totality of counsel's representation. Id. ; Frangias v. State , 450 S.W.3d 125, 136 (Tex. Crim. App. 2013).
A failure to make a showing under either prong defeats a claim for ineffective assistance. Rylander v. State , 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003). The Strickland test "of necessity requires a case-by-case examination of the evidence." Williams v. Taylor , 529 U.S. 362, 382, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (quoting Wright v. West , 505 U.S. 277, 308, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (Kennedy, J., concurring in judgment)).
B. The First Strickland Prong
"[R]elevant evidence may be presented which the jury may consider to negate the mens rea element. And this evidence may sometimes include evidence of a defendant's history of mental illness." Ruffin v. State , 270 S.W.3d 586, 591, 596 (Tex. Crim. App. 2008) (quoting Jackson v. State , 160 S.W.3d 568, 574 (Tex. Crim. App. 2005) ). Parmer's medical records, admitted during the guilt/innocence phase of his trial, demonstrated he had a long history of mental illness, including psychotic disorders, schizophrenia, anxiety syndrome, bipolar affective disorder, unsocialized aggressive disorder, undersocialized conduct disorder, and aggressive outbursts. Approximately six weeks after the incident, Parmer's doctors noted that "[h]e is limited by his primary mental illness" and that Parmer's decision to stop taking prescribed medications was "probably related to his paranoid state and or side-effects." Parmer was previously hospitalized as a result of his responses to "internal stimuli." He would pace in public streets while "talking to people who were not there," sometimes becoming angry. Given testimony from officers that Parmer's girlfriend reported that he was acting strangely, and Bettis' description of Palmer's *729 demeanor just prior to the shooting, we can certainly conceive a reasonable trial strategy for counsel to stipulate to the inclusion of Parmer's medical records into evidence.
However, the medical records contained numerous, often detailed, references to Parmer's extraneous offenses, prior bad acts, and unpopular attitudes, which were admitted without objection. First, the records showed that in 1998, Parmer was admitted to Terrell State Hospital because "[h]e had taken a rifle to work. He had frightened people. He would not get out [of] the building for police for 6 hours. He was uncooperative with the police," and "[h]is urine toxicology was positive for amphetamines and marijuana." At that time, Parmer's treating doctor wrote, "I do feel that [Parmer] has a substance abuse problem." The doctor described Parmer as extremely narcissistic with a "tendency to be impulsive at times."
In 2002, Parmer was again admitted to Terrell State Hospital because he "bec[a]me too much for [his] parents to handle and he said he destroyed several bedrooms and a bathroom." At that time, the records indicated that Parmer started using drugs when he was fifteen years old, and in 2002, "used an extensive amount of money because he was using speed" and drinking alcohol, and had acquired "gambling debt." The records indicated that Parmer had previously been admitted to "Timberlawn, Green Oaks, Parkland a number of times" and that these admissions were "[u]sually ... associated with his drug history." Parmer's medical records also reflected,
The patient said he has been in trouble with the law so many times until he really did not want to go into all the details. He said when he was in high school, he was arrested for possession of a controlled substance. He said about two and a half years ago, the SWAT Team came to his job and said he was holding someone hostage. He said he was stopped numerous times by the police ... thinking he [had] drugs.
During a 2003 psychological evaluation, he was perceived as a "[d]anger to self, others and danger of deterioration." The notes recited that Parmer had told his evaluator, "Yes, I am prejudiced and I am a member of the Ku Klux Klan." During a third admission to Terrell State Hospital, Parmer "said that he was using amphetamine heavily."
"It is a well established and fundamental principle in our system of justice that an accused person must be tried only for the offense charged and not for being a criminal (or a bad person) generally." Templin v. State , 711 S.W.2d 30, 32 (Tex. Crim. App. 1986). "It is for this reason that Anglo-American jurisprudence has always shown a marked reluctance to admit evidence of extraneous offenses or prior misconduct." Id. "Such evidence carries with it the danger that a defendant in a criminal action may be convicted of an implied charge of having a propensity to commit crimes generally rather than the specific offense for which he is on trial." Id. Thus, if the prior bad act or extraneous offense is inadmissible, "there can be no reasonable trial strategy for introducing it before the jury." Huerta v. State , 359 S.W.3d 887, 892 (Tex. App.-Houston [14th Dist.] 2012, no pet.) (citing Robertson v. State , 187 S.W.3d 475, 485-86 (Tex. Crim. App. 2006) ); see Ex parte Menchaca , 854 S.W.2d 128, 132 (Tex. Crim. App. 1993) ("to pass over the admission of prejudicial and clearly inadmissible evidence, as here, has no strategic value") (quoting Lyons v. McCotter , 770 F.2d 529, 534 (5th Cir. 1985) ).
We look to the Texas Rules of Evidence to judge the admissibility of evidence. See *730 Blount v. State , 64 S.W.3d 451, 455 (Tex. App.-Texarkana 2001, no pet.). Rule 401 defines relevant evidence as evidence that has a tendency to make a fact of consequence to the action more or less probable than it would be without the evidence. TEX. R. EVID . 401. Further, unless authorized by statute, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID . 404(b)(1). "This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID . 404(b)(2).
Evidence of Parmer's prior drug usage from medical records seven years prior to the incident, including references that he was arrested for possession of a controlled substance, gambled, and was a member of the Ku Klux Klan,[7] did not make the fact of whether Parmer intentionally or knowingly attempted to cause Vaughan's death, a person who he knew was a peace officer, more or less probable. See Aguillen v. State , 534 S.W.3d 701, 716 (Tex. App.-Texarkana 2017, no pet.). Accordingly, this evidence was irrelevant to the case, and the State does not argue otherwise. Nor was this evidence admissible under Rule 404(b)(2). See Blount , 64 S.W.3d at 456 (concluding that no reasonable attorney would have refrained from objecting to extraneous transaction evidence of defendant's "involvement in an unauthorized use of a motor vehicle offense, using drugs, and associating with a gang" since the extraneous acts were not probative of identity, opportunity, or motive in the trial of defendant's charge for aggravated sexual assault of a child).
Additionally, apart from character conformity, evidence that Parmer took a weapon to work in 2002, frightened people, and possibly held someone hostage had no bearing on Parmer's motive or intent to shoot Vaughan, his opportunity to do so, his plan or preparation, an absence of mistake or lack of accident, or any other purpose authorized by Rule 404(b).[8] See Booker v. State , 929 S.W.2d 57, 65 (Tex. App.-Beaumont 1996, pet. ref'd) (holding that a defendant's prior attempted capital murder charge had no relevance apart from character conformity when used in a subsequent capital murder trial); Lazcano , 836 S.W.2d at 660 (concluding that evidence showing a defendant choked someone was inadmissible under Rule 404 in a murder trial where the victim was choked to death because the evidence did not pertain to the same victim and failed to demonstrate motive or intent to murder the victim).
"[W]hether counsel's performance was deficient turns on the question of whether the evidence was admissible." Blount , 64 S.W.3d at 455. Because we determine that the extraneous-offense evidence contained in Parmer's medical records was inadmissible, we conclude that no reasonable trial strategy could have supported counsel's choice to refrain from objecting to the admission of this evidence during guilt/innocence.
We find the first Strickland prong met.[9]
*731 C. The Second Strickland Prong
Next, we examine whether there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. Here, we find probability sufficient to undermine confidence in the outcome where the effect of the error permeated the entire case and went to the heart of counsel's only defensive issue.
Parmer's only defense strategy was to raise the issue of whether he had the intent to intentionally and knowingly attempt to cause Vaughan's death, an element which the State was required to prove beyond a reasonable doubt. No opening statement was made and no witnesses were presented on Parmer's behalf. During its closing argument, the defense argued,
Yes, if you find Mr. Parmer was intentionally trying to kill him, of course, I know what your verdict is going to be. But that's what you've got to reach, that height that shows, yes, there was an intent by Mr. Parmer to actually kill him. Not to get him off his property, but to kill him.
And that's why we are arguing that the State has not reached that height that Mr. Parmer meant to kill a guy, to kill this-to kill Mr. Vaughan. That's what I'm arguing to you, that there was no such intent. The intent there was to "Get off my property." That was the intent.
An extraneous offense "is never admissible merely to encourage the inference that an accused is probably guilty because he committed other crimes." Abdnor v. State , 808 S.W.2d 476, 478 (Tex. Crim. App. 1991) (per curiam) (en banc) (citing Williams v. State , 662 S.W.2d 344 (Tex. Crim. App. 1983)). Yet, during its closing argument, the State drew the jury's attention to Parmer's medical records and emphasized the extraneous offenses when discussing whether Parmer had the intent to commit attempted capital murder. The State argued, without objection:
The Defendant knew what he was doing. He intended to do what he did. And he almost killed Larry Vaughan when he was doing it.
Now, I told you we hadn't looked at all of the medical records. And it's a-State's Exhibit No. 23 is some medical records from the Defendant. And it goes over and looks at some trips to the Terrell State Hospital that the Defendant had.
The first trip reflected in these records is November of 1998 where he was taken to the Terrell State Hospital because he had taken a rifle to work and frightened people. He was uncooperative with the police, and he had amphetamines and marijuana in his urine.
The counselor felt that he had a substance abuse problem, anti-social personality, and that the Defendant stated he usually goes about town with a loaded shotgun in his car. And he was extremely narcissistic. That's in 1998.
The doctor made a finding of amphetamine-induced psychotic disorder, anti-social personality disorder, and problems with interaction with the legal system. That was in 1998.
That was still the case in 2007 [sic], wasn't it?
Later on in March of 2002, the Defendant's back at that same hospital. This time he had become too much trouble *732 for his parents to handle and destroyed several bedrooms and a bathroom. The police arrested him and brought him in, where the doctor noted that he was very uncooperative and very narcissistic. That's four years later. It's the same thing. They noted that he was quite guarded, angry, and hostile in 2002 when he was taken in.
Then finally, in June of 2003, he was taken in once again for amphetamine psychosis. During that trip in 2003, the Defendant made some statements to the doctor who was evaluating, when he asked him if he had been arrested, the Defendant's answer was, "Hell yeah. Hell yeah, I've been arrested."
Cogently, after the jury was charged and retired for deliberations after having heard these closing arguments, the jury sent a note specifically requesting to see a copy of Parmer's medical records. The jury found Parmer guilty, assessing him the maximum penalty of life imprisonment and a $10,000.00 fine.
Here, the totality of counsel's representation raises concern.[10] See Strickland , 466 U.S. at 694, 104 S.Ct. 2052. Counsel made no attempt to redact the medical records to remove the extraneous offense evidence. With respect to the jury charge, counsel did not seek an instruction (and the jury was never instructed) that the jury could not consider the extraneous-offense evidence unless the jurors believed beyond a reasonable doubt that Parmer committed those acts.[11] Further, it appears that medical records indicating that Parmer may have taken a rifle to work were referenced in conjunction with the State's argument on whether Parmer had the intent to commit attempted capital murder. Again, counsel did not request an instruction (and the jury was never instructed) that the jury could consider this extraneous act only for the limited purpose for which it may have been offered, if any. See Varelas , 45 S.W.3d at 631 (finding that counsel's ineffective assistance in failing to request a limiting instruction prejudiced defendant because it permitted the jury to consider extraneous acts as direct evidence of defendant's guilt). Accordingly, the extraneous-offense evidence could have been taken as direct evidence of guilt. See ids="11096016" index="54" url="https://cite.case.law/sw3d/45/627/#p629">id. Additionally, even in light of evidence indicating Parmer's mental condition when the incident occurred, although Parmer's sole defensive issue was intent, counsel never argued that Parmer's mental illness negated the mens rea element. Rather, it appears that as a result of counsel's actions, Parmer's medical records were used against him in a manner not permitted by the Texas Rules of Evidence and against "a fundamental principle in our system of justice." Templin , 711 S.W.2d at 32 ; see TEX. R. EVID . 404(b).
In Varelas , the Texas Court of Criminal Appeals determined that counsel's failure to request appropriate burden of proof and limiting instructions for the extraneous-offense evidence prejudiced the defendant because (1) the jury was not properly instructed *733 on how to apply the law to the facts, and (2) when a jury charge does not contain an accurate description of the law, "the 'integrity of the verdict is called into doubt.' " Varelas , 45 S.W.3d at 633 (quoting Abdnor , 971 S.W.2d at 731). Similarly, here, in light of the nature of Parmer's sole defense, the arguments presented by the State, the charge given in this case, and the request by the jury to be given copies of Parmer's medical records, we conclude that "the jury was likely to consider the extraneous acts as direct evidence of [defendant's] guilt; that is, that he acted in conformity with his character." Id. at 634. In other words, as in Varelas , the jury could have used the extraneous offenses to demonstrate that Parmer was a criminal generally, meaning that "the likelihood of the jury finding applicant guilty of capital murder dramatically increased." Id. at 635 (also concluding that the defendant's "chances for being convicted only of a lesser-included offense[ ] were severely diminished").
"[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Strickland , 466 U.S. at 693, 104 S.Ct. 2052. The Supreme Court "found this 'outcome-determinative' standard ... too heavy a burden on defendants, and that its use was not appropriate." Nealy v. Cabana , 764 F.2d 1173, 1178 (5th Cir. 1985) (citing Strickland , 466 U.S. at 693-95, 104 S.Ct. 2052 ). "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland , 466 U.S. at 694, 104 S.Ct. 2052. "[T]he question is whether there is a reasonable probability that, absent the errors, the fact[-]finder would have had a reasonable doubt respecting guilt." Id. at 695, 104 S.Ct. 2052.
Absent the extraneous offense evidence, the jury would have been presented with (1) the admissible portions of Parmer's mental health history, (2) evidence that Parmer was acting strangely on the day of the incident, and "wasn't making ... any sense whatsoever" just prior to the shooting, and (3) officer testimony that Parmer made statements indicating that he wanted people to get off of his property just before the shooting-all of which could negate the mens rea element.[12] In light of this evidence, the jury would have to find, beyond a reasonable doubt, that Parmer intentionally or knowingly attempted to cause Vaughan's death, whom he knew to be a police officer. Given these facts, we cannot say that there is no reasonable probability that, absent the errors, the fact-finder would have had a reasonable doubt respecting guilt.
In this case, for all of the reasons mentioned above, we find that counsel's failure to object to the admission of inadmissible extraneous-offense testimony, which the jury was allowed to impermissibly use as direct evidence of intent and of his guilt, created a probability sufficient to undermine confidence in the jury's finding that Parmer intentionally or knowingly attempted to cause Vaughan's death.
III. Conclusion
We reverse the trial court's judgment and remand this case for a new trial.

See Tex. Penal Code Ann . § 15.01 (West 2011), § 19.03 (West Supp. 2017).

Parmer's counsel originally filed an Anders brief in this Court. See Anders v. California , 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). Our independent review of the appellate record revealed several arguable points of error. Accordingly, we abated this appeal for the appointment of new counsel, and we requested additional briefing on the following issues:
(1) whether trial counsel rendered ineffective assistance by failing to object to the inclusion, during guilt/innocence, of the defendant's medical records, which contained evidence of several extraneous offenses and prior bad acts; (2) whether trial counsel rendered ineffective assistance by failing to request, during guilt/innocence, an extraneous-offense instruction under Article 37.07 of the Texas Code of Criminal Procedure ; (3) whether the evidence is legally sufficient to prove that the defendant intended to kill; (4) whether the trial court erred in failing to charge the jury on lesser-included offenses; (5) whether trial counsel rendered ineffective assistance during punishment by failing to object to the State's argument that the jury should assess a $10,000.00 fine because "[i]t's never going to get paid; it doesn't matter"; and (6) whether the trial court had authority under Section 3.03 of the Texas Penal Code to cumulate Parmer's sentence with that of a prior offense.
Our resolution of the first issue, which the State's brief did not mention, is dispositive of this appeal.

In describing the darkness of that night, Vaughan testified, "It wasn't so dark that you couldn't see your hand in front of your face or anything like that, but it was-it was pretty dark. And after the lights went off on the trailer, it was even darker than that."

The State's indictment alleged that Parmer, on March 7, 2010,
with the specific intent to commit the offense of Capital Murder of LARRY VAUGHAN, do an act, to-wit: shoot LARRY VAUGHAN with a deadly weapon, to-wit: a firearm, which amounted to more than mere preparation that tended but failed to effect the commission of the offense intended and the said LARRY VAUGHAN was then and there a peace officer who was acting the lawful discharge of an official duty, to-wit: attempting to serve a warrant on the Defendant, and the Defendant knew LARRY VAUGHAN was a peace officer....

White was positioned at the back of the house.

"[The] diminished-capacity doctrine at issue in this case is simply a failure-of-proof defense in which the defendant claims that the State failed to prove that the defendant had the required state of mind at the time of the offense." Jackson v. State , 160 S.W.3d 568, 573 (Tex. Crim. App. 2005). During punishment, Parmer testified, "I would like to let [Vaughan] know how truly sorry I am. That in my madness, I did something that nobody in their right mind should forgive me for."

While it has been "held that extraneous offenses are admissible to illustrate an accused's ill will towards all persons within a certain class of people," our appellate record established that Vaughan was Caucasian. See Lazcano v. State , 836 S.W.2d 654, 660 (Tex. App.-El Paso 1992, pet. ref'd) (citing Dillard v. State , 477 S.W.2d 547, 551 (Tex. Crim. App. 1971) ).

Identity was not at issue.

"[E]ven a single instance of attorney error can rise to the level of deficient performance, if the error was egregious and had a seriously deleterious impact on the balance of the representation." Frangias v. State , 450 S.W.3d 125, 136 (Tex. Crim. App. 2013).

In referencing the totality of counsel's representation, we do not imply that any single act, taken alone, established ineffective assistance. Rather, we hold only that counsel's failure to object to the extraneous-offense evidence constituted an act of ineffective assistance, and look only to other aspects of counsel's representation in addressing whether Parmer was prejudiced by the admission of the extraneous-offense evidence.

"If a defendant, during the guilt/innocence phase, asks for an instruction to the jury on the standard of proof required for admitting extraneous offenses, the defendant is entitled to that instruction." See Varelas , 45 S.W.3d at 631 (quoting Mitchell v. State , 931 S.W.2d 950, 954 (Tex. Crim. App. 1996) ).

The jury also heard conflicting evidence of whether Parmer knew that the people who came on his property under the cover of darkness were known by him to be police officers.