

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00144-CR
No. 02-20-00145-CR

_____

JIMMY DUANE EASTER, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 43rd District Court
Parker County, Texas
Trial Court Nos. CR17-0014, CR20-0661

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Jimmy Duane Easter appeals two convictions for possession of less than one gram of a controlled substance (methamphetamine) for which he received concurrent sentences of twenty-three months' confinement in a state-jail facility. *See* Tex. Health & Safety Code Ann. §§ 481.102(6) (listing methamphetamine under Penalty Group 1), .115(b) (providing that possession of less than one gram of a substance in Penalty Group 1 is a state-jail felony). In one point, Easter argues that his trial counsel rendered ineffective assistance by (1) not filing a request for notice of extraneous offenses, (2) not objecting to the extraneous offenses, and (3) not objecting to a leading question. Because Easter has not shown that his trial counsel rendered ineffective assistance, we overrule his point and affirm the trial court's judgments.

## II. PROCEDURAL BACKGROUND

Easter's two cases come to us with different procedural histories.

### A. Deferred Adjudication, Modification, and Adjudication

In trial court cause number CR17-0014 (appellate court cause number 02-20-00144-CR), the State indicted Easter in January 2017 for possession of a controlled substance (methamphetamine) of less than one gram. Later that same year, in April 2017, after Easter had pled guilty, the trial court placed him on deferred-adjudication community supervision.

2

In November 2019, the State filed a petition to proceed to an adjudication in which it alleged that Easter had twice possessed and had twice failed to abstain from using methamphetamine and that Easter had failed to attend, participate in, and successfully complete a substance-abuse counseling program. After Easter pled true, however, the trial court did not grant the State's petition but, instead, signed in March 2020 an order modifying Easter's conditions of community supervision.[1]

In June 2020, the State filed another petition to proceed to an adjudication. In the State's petition, it alleged that on or about May 17, 2020, Easter had (1) intentionally or knowingly possessed less than one gram of a controlled substance (methamphetamine) and (2) failed to abstain from using a controlled substance (methamphetamine), both of which were violations of his terms of community supervision. At the hearing in October 2020, Easter pled true to the allegations. The trial court granted the State's petition to proceed to an adjudication, found Easter guilty of possession of less than one gram of a controlled substance (methamphetamine), sentenced him to twenty-three months' confinement in a state-jail facility, and credited Easter with 365 days for time served.

## B. Indictment and Conviction

In trial court cause number CR20-0661 (appellate court cause number 02-20-00145-CR), in the indictment, the State alleged that on or about July 9, 2020, Easter

---

[1]From the paperwork, we cannot determine whether he pled true to only some or to all of the allegations.

3

had intentionally or knowingly possessed less than one gram of a controlled substance (methamphetamine). Easter pled guilty without a plea bargain. The trial court found Easter guilty, sentenced him to twenty-three months' confinement in a state-jail facility, and credited him with ninety days for time served.

## C. Concurrent, not Consecutive, Sentences

The trial court ordered the two sentences to run concurrently.

## III. STANDARD OF REVIEW

The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. *Ex parte Scott*, 541 S.W.3d 104, 114 (Tex. Crim. App. 2017); *see* U.S. Const. amend. VI. To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *Thompson v. State*, 9 S.W.3d 808, 813–14 (Tex. Crim. App. 1999). Our review of counsel's representation

4

is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

An appellate court may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel did not have that opportunity, we should not conclude that counsel performed deficiently unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308. Direct appeal is usually inadequate for raising an ineffective-assistance-of-counsel claim because the record generally does not show counsel's reasons for any alleged deficient performance. *See Menefield*, 363 S.W.3d at 592–93; *Thompson*, 9 S.W.3d at 813–14.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308.

5

We must ultimately focus on examining the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.*, 104 S. Ct. at 2069.

## IV. DISCUSSION

### A. Extraneous Offenses and Bad Acts

Regarding extraneous offenses and bad acts, Easter's complaint has two prongs. First, he complains that trial counsel failed to file a request for notice of extraneous offenses or bad acts under either Section 3(g) of Article 37.07 or Rule 404(b). *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(g); Tex. R. Evid. 404(b). Second, he asserts that trial counsel failed to object on the bases of Rules 401, 403, or 404(b) of the Texas Rules of Evidence. *See* Tex. R. Evid. 401, 403, 404(b). As a result, he concludes that the State was able to present evidence that he had dealt drugs and had physically abused his girlfriend.

### 1. Failure to Request Notice

Trial counsel's failure to file pretrial motions generally does not result in ineffective assistance of counsel. *Autry v. State*, 27 S.W.3d 177, 182 (Tex. App.—San Antonio 2000, pet. ref'd). In the specific context of a failure to request notice of extraneous offenses or bad acts, to establish that counsel rendered deficient performance, an appellant must show that he was entitled to notice of the extraneous

6

offenses or bad acts that the State introduced into evidence at trial. *Jaubert v. State*, 74 S.W.3d 1, 2 (Tex. Crim. App. 2002). Significantly, defendants are only entitled to notice of the State's intent to use extraneous offenses or bad acts during its case-in-chief; defendants are not entitled to notice of extraneous offenses or bad acts that the State introduces into evidence during cross-examination or rebuttal. *Id.* at 3–4. Thus, counsel cannot render deficient performance by failing to request notice if the State introduced no evidence of extraneous offenses or bad acts during its case-in-chief. *See id.*

Here, all the alleged extraneous offenses and bad acts about which Easter complains came in after the State had presented its case-in-chief and rested. Thus, Easter's argument fails. *See id.*

### 2. Calling Vinson as a Witness

Because the alleged extraneous offenses and bad acts came in primarily through Easter's own witness, Melissa Vinson (Easter's girlfriend), Easter attacks trial counsel's decision to call her as a witness. He contends that her testimony did more to damage his cause than to help it.

We disagree. As we will explain below, the evidence did not show that Easter was a drug dealer. At best, it showed that he shared his drugs with Vinson. Although Vinson admitted her own drug use, she also maintained that she had stopped using methamphetamine in 2017. Nor did the evidence show that Easter had engaged in domestic violence. Most importantly, when asked, "Will you be there for Mr. Easter

7

regardless of what the Judge does this afternoon?" Vinson answered, "Yes, sir." Vinson was Easter's only identifiable support.

At the time of the hearing, Easter was fifty-nine years old. He had been on disability since 2005. He had no children, and although he mentioned his mother, father, and brother, nothing in his testimony suggested that he had any ongoing relationship with them. Easter also mentioned an uncle, whom he described as his "best friend in the world." Easter explained that he had started using methamphetamine after his uncle had committed suicide five or six years earlier and that he "had to go pick him up out of the room and clean up the mess, too." "And that," Easter said, "wasn't no fun thing to do." Vinson was thus the only person helping Easter on a day-to-day basis.

### 3. Drug Dealing

Specifically, regarding drug dealing, Easter complains about the following exchange:

> Q. All right. Ms. Vinson, do you use methamphetamine?
>
> A. No longer. No, ma'am. No, ma'am.
>
> Q. Did you say: No longer?
>
> A. Yeah, I did use to.
>
> Q. Okay. And when did you stop using methamphetamine?
>
> A. It was 2017, I think.
>
> . . . .

Q. Okay. Do you know where Mr. Easter would get his meth from?

A. No, ma'am.

Q. You don't know?

A. No.

Q. Who did you get your meth from?

A. With him.

Q. So, he would buy it; and you would use it with him?

A. Uh-huh.

Even before Vinson testified, however, evidence came in showing that Easter and Vinson had used methamphetamine together. In the probation department's "Chronologicals," admitted as State's Exhibit 4, an entry under October 11, 2017, provides: "[Easter] also states that he let his gf [Vinson] come home last month. [Easter] states that they both used together and [that] they are both drug free and [that] they are getting along without incident." When substantially the same evidence comes in elsewhere without objection, any error in admitting the evidence is harmless. *Schmidt v. State*, 612 S.W.3d 359, 369 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd).

Furthermore, to the extent that trial counsel did not object to evidence showing that Easter and Vinson had used methamphetamine together, the evidence did not show that Easter was a drug dealer. A drug dealer is "a person who buys and sells drugs illegally." Dictionary.com, https://www.dictionary.com/browse/dealer (last

9

visited Feb. 7, 2021). Easter denied paying cash for drugs; he maintained that he was given drugs in return for helping other people with their cars. And the evidence suggests that Easter shared his drugs with Vinson, not that he sold drugs to her.

Technically, though, sharing drugs with another person constitutes a delivery. To "deliver" a controlled substance, compensation is not required. *See* Tex. Health & Safety Code Ann. § 481.002(8) ("'Deliver' means to transfer, actually or constructively, to another a controlled substance, counterfeit substance, or drug paraphernalia, regardless of whether there is an agency relationship. The term includes offering to sell a controlled substance, counterfeit substance, or drug paraphernalia."); *Fontenot v. State*, 792 S.W.2d 250, 256 (Tex. App.—Dallas 1990, no pet.) ("[W]e hold that the concept of 'delivery' includes sharing drugs with third persons[] and is not limited to commercial ventures."); *see also Johnson v. State*, No. 03-07-00230-CR, 2007 WL 3306582, at *5 (Tex. App.—Austin Nov. 9, 2007, no pet.) (mem. op., not designated for publication) (citing *Fontenot*, 792 S.W.2d at 256). For purposes of prejudice though, sharing drugs with a girlfriend may not be perceived as harshly as dealing drugs for profit.

### 4. Domestic Violence

Easter then turns to instances when, he asserts, the testimony suggested that he had engaged in domestic violence:

> [Prosecutor:] Q. Okay. Would it be surprising to you to know that Mr. [Jason] Kennedy actually contacted Probation to let them know he was going to your house daily on domestic issues?

10

[Vinson:] A. I didn't know he was going to the house daily. On domestic issues? No.

Q. So, you haven't called the Parker County Sheriff's Office to come out to your house on domestic issues?

A. I called when I was going through that property, to get my stuff out.

This information regarding Kennedy had already been introduced into evidence in the probation office's "Chronologicals" under the entry for June 11, 2020: "Jason Kennedy from the task force called and states that they are going out there daily for domestic issues. H[e] was told that VR [(a victim's report?)] was filed last month and CSO [(the community supervision officer)] sent an email yesterday inquiring. He is going to call the DA[.]" Because substantially the same evidence came in elsewhere without objection, any error in admitting it was harmless. *See Schmidt*, 612 S.W.3d at 369. To the extent that this exchange may have addressed domestic violence, Vinson denied any domestic violence. And although Vinson admitted calling the sheriff's office, she effectively denied that the call had anything to do with domestic violence.

Later, using the term "domestic issues," the prosecutor persisted:

Q. And, actually, on multiple times, you left; and y'all have gotten back together; and these domestic issues have been going on the entire time that he's been on probation from 2017 up until now?

A. I've left three times in eight years, and I was back within a month each time.

11

The most that this exchange shows is that there were breaks in Easter and Vinson's relationship; it does not show that domestic violence was part of that relationship or that domestic violence was the reason that she had left in the past.

When Easter himself testified, the prosecutor asked him about domestic violence, and Easter denied any violence by him or by Vinson:

> Q. Okay. Do you also know Mr. Kennedy because Mr. Kennedy has been called out to your residence on several occasions for domestic violence?
>
> A. No, they never been there on domestic violence. I never laid a hand on her, and she's never laid a hand on me.
>
> Now, do we argue? Well, absolutely; but, as far as domestic viol[ence], no, ma'am.

Try as the prosecutor might, her questions regarding domestic violence consistently produced negative responses.[2]

Furthermore, other testimony affirmatively refuted that Easter had engaged in violence. For example,

> Q. (By [trial counsel to the community supervision officer]) All your records indicate that the only real problem that Mr. Easter had was drugs?
>
> A. I would agree with that.

---

[2]The "Chronologicals" has one entry that uses the word "fighting": "[Easter] stated that he and [Vinson] keep fighting re: her friends who come over. Asked if it is her friends or his friends who come over with the drugs: he replied[,] '[B]oth[.'"] "Fight" can mean a physical dispute, but it can also mean any dispute. *See* Dictionary.com, https://www.dictionary.com/browse/fight (last visited Feb. 7, 2021).

Q. Okay. The whole time that you supervised him, he was cooperative?

A. Correct.

Q. Honest?

A. Yes.

Q. Okay. Anything in your records at all that indicate that he was a man of violence of any kind?

A. Not that I recall.

Q. Okay. No charges[—]that you know of[—]of violence?

A. No.

Q. He was never violent towards you?

A. That's correct.

When the prosecutor followed up, she got the same response:

Q. All right. And -- and let me ask you: Regarding Mr. Easter, he's friendly and comes in and reports and all that; and he's not violent to your knowledge? To your knowledge --

A. Correct.

Q. -- he wasn't violent to you.

Vinson herself, when asked by trial counsel on direct examination, denied that

Easter had engaged in violence:

Q. In those eight years that you've been together with Mr. Easter, have you ever seen any tendency for him to be violent towards anybody?

A. No.

13

Q. Has he ever been violent towards you?

A. No, sir.

Q. Your children?

A. No, sir.

Consequently, we disagree with Easter's assertion that the State successfully introduced evidence of domestic violence.

## 5. Final Arguments

Neither the prosecutor nor trial counsel relied on the presence of drug dealing or domestic violence as a theme during final arguments. Just the opposite, trial counsel stressed the absence of any drug dealing or violence.

The prosecutor referred to new offenses: "Now, we have new offenses in addition to the drug use." When she continued, however, she limited the new offenses to possession: "And, then as far as the new offense, Judge, you know, it's possession of methamphetamine. So, it's the same thing that he's been doing all these years."

For his part, trial counsel affirmatively denied that there was any evidence that Easter was violent: "But I do think there's been no evidence presented to the [c]ourt about this man being violent." He also refuted any concern about drug dealing: "There's no evidence that this man is a dealer." Trial counsel argued that Easter was the victim of his own offense: "There is -- the only evidence we have in this case is the fact that he's hurting himself. He's harming himself."

14

## 6. The Trial Court's Comments

When sentencing Easter, the trial court—commenting on Easter's testimony that he did not pay for his drugs but was given drugs after helping other people with their cars—affirmatively stated that it did not think that Easter was a drug dealer:

> THE COURT: But I always find it difficult and hard to believe that people that sell drugs -- and I'm not saying you sell drugs either, but people that sell drugs, normally sell them. They don't give them away. And that always just -- I find that amazing when people come in and say: ["]Oh, yeah, they give me drugs.["] Normally, that's for cash; and maybe you're swapping that out for working on their cars. I don't know.

Also on the record, the trial court affirmatively stated that it did not think that Easter was violent and that it was basing its decision on Easter's lack of success while on community supervision:

> The problem I have got, Mr. Easter, is this sounded like the same song, same dance that I've heard every time. Mr. Smith,[3] your last attorney, this is exactly the same thing that I heard when he was here. You obviously have a drug problem.
>
> [Easter]: Yes, sir, Your Honor. I understand.
>
> THE COURT: I mean, I think everybody in this courtroom has heard you self-admit. You have a drug problem.
>
> [Easter]: Yes, sir.
>
> . . . .
>
> [THE COURT:] But, in light of just kind of all the chances that you have had, Mr. Easter -- and I've heard, you know: ["]Just one more

---

[3]Smith was listed as Easter's counsel on the March 25, 2020 modification order.

chance.["] I think the last time you were here, you were telling me: ["]I'm not going to be back here. I've learned my lesson.["] Here you are.

[Easter]: I understand.

. . . .

THE COURT: And, Mr. Easter, I want to say that I heard loud and clear that you're not a violent person. You have a drug problem.

[Easter]: Yes, sir.

THE COURT: And I'm not sure that you've hit bottom, and you've been to every treatment facility that I could --

[Easter]: I have -- I have --

THE COURT: -- offer you.

Nothing in what the trial court said supports the argument that it relied on drug dealing or domestic violence when assessing Easter's punishment; just the opposite, the trial court's comments negate that argument.

### 7. *Davis* and *Parmer*

In Easter's brief, he relied on two cases, *Davis v. State*, 413 S.W.3d 816 (Tex. App.—Austin 2013, pet. ref'd), and *Parmer v. State*, 545 S.W.3d 724 (Tex. App.—Texarkana 2018, no pet.). Both cases are distinguishable.

In *Davis*, defense counsel elicited or failed to object to evidence from three witnesses about extraneous acts of aggression that the defendant had allegedly engaged in years after the alleged murder for which he was on trial. 413 S.W.3d at 837–38. In contrast, Easter's trial counsel elicited testimony that Easter was not

16

violent, the State's efforts to show that he was violent failed, and the trial court stated on the record that it did not think that Easter was violent.

In *Parmer*, the defendant "had a long history of mental illness, including psychotic disorders, schizophrenia, anxiety syndrome, bipolar affective disorder, unsocialized aggressive disorder, undersocialized conduct disorder, and aggressive outbursts." 545 S.W.3d at 728. Before trial, defense counsel stipulated to the admission of the defendant's medical records, which described the defendant's long history of mental illness. *Id.* at 727. Significantly, though, the medical records also contained many detailed references to extraneous offenses, prior bad acts, and unpopular views, such as the defendant's membership in the Ku Klux Klan. *Id.* at 727, 730. In light of the nature of the defendant's defense, the State's arguments, the court's charge, and the jury's request to be given a copy of the defendant's medical records, the court concluded that the jury likely considered the extraneous acts as direct evidence of the defendant's guilt, that is, that they showed that the defendant had acted in conformity with his character when allegedly committing the indicted offense. *Id.* at 733. In Easter's case, although the question of domestic violence came up, the evidence consistently showed that Easter did not engage in violence, domestic or otherwise. Regarding delivery of a controlled substance, the evidence showed that Easter might have committed that offense when he shared his methamphetamine with his girlfriend, but the trial court's comments showed that Easter's sharing his drugs with Vinson played no role in its decision.

We hold that both *Davis* and *Parmer* are distinguishable.

## 8. Resolution

For all the reasons set out above, we cannot conclude that trial counsel's handling of the alleged extraneous offenses and bad acts was conduct so outrageous that no competent attorney would have engaged in it. *See Nava*, 415 S.W.3d at 308.

## B. Leading Question

Easter next complains that the prosecutor asked a leading question to which trial counsel did not object:

> [Prosecutor: Q.] But let me ask you: If someone is on probation for drugs, for using drugs[,] and they continue to use those drugs throughout the entire probation, three years as of right now -- a little bit over three years, is there any -- and your department has given them many tools to stop using, is there any reason to leave that person on probation?
>
> [Community supervision officer:] A. I would say no.

Easter argues, "The unobjected-to-leading question was a glaring, verbalized justification laid out for the trial court to revoke and sentence at near the maximum, which is exactly what occurred."

Assuming, without deciding, that the question was a leading one, we begin by noting that the record does not contain trial counsel's explanation for not objecting. Easter filed a timely motion for new trial in each case that the trial court denied in written orders, but he did not allege ineffective assistance of counsel. The record is thus silent regarding trial counsel's rationale. Generally, a silent record that provides

18

no explanation for trial counsel's actions will not overcome the strong presumption that counsel rendered reasonable assistance. *See Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003); *Ramirez v. State*, No. 02-14-00062-CR, 2015 WL 2437873, at *5 (Tex. App.—Fort Worth May 21, 2015, no pet.) (mem. op., not designated for publication). Despite the general rule disfavoring the use of leading questions on direct examination, not objecting when the evidence will come in anyway can be sound trial strategy. *Wheeler v. State*, 433 S.W.3d 650, 655–56 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd).

On this record, we cannot conclude that trial counsel's failure to object was conduct so outrageous that no competent attorney would have engaged in it. *See Nava*, 415 S.W.3d at 308. The crux of the question was whether Easter's community supervision should be revoked, not whether Easter should receive the maximum punishment. The evidence showed that Easter was convicted of possession in 2017 and was still using methamphetamine in 2020. The State filed a petition to proceed to an adjudication not once but twice; its position was straightforward. Easter's position was not to contest any of these facts; he pled true to the petition and guilty to the new indictment. He was hoping for leniency based on—to some extent—extenuating circumstances, such as his disability and the absence of any violence in his history.

19

## C. Ruling

We hold that Easter failed to prove by a preponderance of the evidence that trial counsel's representation was deficient or that any alleged deficiency prejudiced his defense. We overrule Easter's sole point. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Nava*, 415 S.W.3d at 307.

## V. CONCLUSION

Having overruled Easter's point, we affirm the trial court's judgments.


/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  February 10, 2022

20